HENRY J. KOERNER, Appellant,    v. ST.    LOUIS
CAR COMPANY.

In Banc, January 27, 1908.

1. **DEMURRER:** Admits Facts. A demurrer to the evidence admits every fact which the jury may infer from the evidence before them, and should be sustained only when the evidence thus considered fails to make proof of some essential averment.

2. **FELLOW-SERVANT:** Exact Expression of Rule. It is impracticable to so define what constitutes the relation of fellow-servants between two of defendant's employees that all cases may be weighed and gauged by it. Unsatisfactory though it be, the rule must remain general, and its application specific as cases arise.

3. ———: Exception to Rule. The exception to the general rule that the master is not liable for injuries to a servant inflicted by a fellow-servant, is perhaps as well stated in Parker v. Railroad, 109 Mo. 1. c. 409, as anywhere else, wherein it is stated that the rule should be applied only in those cases where the servant injured and those inflicting the injuries are so associated and related in their work that they can observe and have an influence over each other's conduct, and can report delinquencies to a common correcting power or head; in short, they should be fellow-servants in fact, and not simply in dialectic theory.

4. ———: ———: Car Painter: Switchman. A painter employed in car sheds, where from 1,000 to 2,500 persons were employed, all under the direction of a general superintendent, the painter under the direction of a foreman, was not a fellow-servant of a switchman, whose duty it was to assist the motorman, both under the immediate direction of the superintendent, to hitch a dummy engine to cars in the sheds and move them to the tracks for use.

5. ———: ———: Limited to Railroads. The same reason which applies an exception to the general fellow-servant rule to railroads, is applicable to large manufacturing plants and other businesses. Where a master is operating a great enterprise

which calls for various departments in the execution of his work, whether it be a railroad or an immense plant for the manufacture and construction of cars, requiring various and distinct branches of labor, whether under different foremen or not, he is within the exception to the rule.

6. ————: **Stare decisis.** The doctrine of *stare decisis* applies to a decision on points arising and decided in the case, on the final result reached, and not to the reasoning by which the result was reached or to discussions of doctrines contained in the opinion or to criticisms of other cases. [Citing Grattis v. Railroad, 153 Mo. 380, and approving of the result reached, but not approving the criticism of the departmental doctrine as applied to fellow-servants.]

7. **NEGLIGENCE: Master and Servant: Reasonably Safe Place.** When the defendant carworks company, through its foreman in charge of the painters, sent plaintiff to work at painting a car, standing as was customary upon its tracks inside the car sheds, it was its duty to provide against other cars running down against the car he was painting and to see to it that other cars which were pulled out of the sheds were not attached to the car upon which he was working without giving him warning of its intention to move said car. The servant does not assume the risk arising from the master's neglect to use suitable precaution for his safety.

8. ————: ————: ————: **At Time Work Began.** It is not sufficient that the place was reasonably safe when the servant was sent to work. The master's duty is a continuing one. If the car which the servant was painting was rendered unsafe by the sending by the master of a switching crew who attached a dummy engine to it without giving him warning that they intended to move it, the master is liable for the consequences of that negligent act.

9. ————: ————: ————: **Vice-Principal: Switchman.** Whenever the master delegates to another the performance of a duty to his servants, which the master has impliedly contracted to perform in person, or which rests upon him as an absolute duty, he is liable for the manner in which that duty is performed by the middle man whom he has selected as his agent. So that the defendant car company, in directing a switchman to move a car on the same track and next to the one which plaintiff at the time in the line of his employment was painting, and that car was moved, without any warning to or knowledge by plaintiff that it was attached to the one on which he was working, the switchman was the company's vice-principal, and the company is liable for his negligence.

10. ———: **Contributory: Matter of Law.** Under the circumstances of this case the court had no right to declare as a matter of law that plaintiff's contributory negligence would bar his recovery, but that was a question that should have been submitted to the jury under proper instructions.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster,* Judge.

REVERSED AND REMANDED.

*Wm. L. Bohnenkamp* and *Wm. R. Gentry* for appellant.

It was stated by the court when the demurrer to the evidence was argued that the court believed the switchman and plaintiff to be fellow-servants and for that reason the demurrer to the evidence was sustained. This fact does not appear in the instruction of the court. (1) Plaintiff was entitled to have his case submitted to the jury on the theory that the act of the switchman in giving the signal to start the dummy without having taken all of the usual precautions and without giving the warning which his duty required him to give, was not the act of a fellow-servant, but was the act of a servant in a different department from the department in which plaintiff was employed and for whose act the master was liable; that as they were working in distinct departments plaintiff and Hensler were not fellow-servants. Lanning v. Railroad, 196 Mo. 647; Dixon v. Railroad, 109 Mo. 413; Parker v. Railroad, 109 Mo. 362; Sullivan v. Railroad, 97 Mo. 113; Condon v. Railroad, 78 Mo. 567; Tabler v. Railroad, 93 Mo. 79; Smith v. Railroad, 92 Mo. 359; Miller v. Railroad, 109 Mo. 350; Swadley v. Railroad, 118 Mo. 268; Jones v. Railroad, 125 Mo. 366; Keoun v. Railroad, 141 Mo. 86; Schlereth v. Railroad, 115 Mo. 87. (2) Aside from the department rule, the switchman, in causing the dummy to be moved in such a way and

in causing the car upon which plaintiff was working to knock down the scaffold, violated the duty owed by the master requiring the master to furnish the servant a reasonably safe place to work, which duty the master could not rid himself of by imposing it upon any servant, whether of high or low position. Dayharsh v. Railroad, 103 Mo. 570; Moore v. Railroad, 85 Mo. 588; Railroad v. Skola, 183 Ill. 454; Railroad v. Fox, 31 Kan. 587; Railroad v. Triplet, 54 Ark. 289; Railroad v. Holcomb, 9 Ind. App. 198; Railroad v. Heiniel, 82 Tex. 623. (3) The evidence concerning the question of plaintiff's exercising ordinary care for his own safety was of such character that plaintiff was clearly entitled to go to the jury on that point. And there was no evidence tending to show that as a matter of law plaintiff was guilty of negligence which directly contributed to cause his injury. Phippin v. Railroad, 196 Mo. 321.

*Seddon & Holland* for respondent.

The court did not err in giving the peremptory instruction asked by respondent (defendant) at the close of all the evidence. (1) Because if there was any negligence on the part of the switchman and motorman on the occasion in question, in starting the car without giving a warning, it was the negligence of fellow-servants of appellant. Card v. Eddy, 129 Mo. 510; Rohback v. Railroad, 43 Mo. 187; Murray v. Railroad, 98 Mo. 573; Higgins v. Railroad, 104 Mo. 413; Relyea v. Railroad, 112 Mo. 86; Grattis v. Railroad, 153 Mo. 380; Purcell v. Tennent Shoe Co., 187 Mo. 276; McCarty v. Rood Hotel Co., 144 Mo. 397; Jackson v. Lincoln Commission Co., 106 Mo. App. 441; Ryan v. McCarty, 123 Mo. 636; Steffen v. Mayer, 96 Mo. 420; Shaw v. Bambrick-Bates Construction Co., 102 Mo. App. 666; Stocks v. Railroad, 106 Mo. App. 129; Sherrin v. Railroad, 103 Mo. 378; Hughes v. Fagin, 46 Mo. App. 37; Sheehan v. Prosser, 55 Mo. App. 569; Dayharsh v. Rail

road, 103 Mo. 570; Forbes v. Dunnavant, 95 S. W. 934; Bowen v. Railroad, 95 Mo. 277; Herbert v. Wiggins Ferry Co., 107 Mo. App. 287; Armour v. Hahn, 111 U. S. 313. (2) Because the injuries complained of by plaintiff were directly contributed to by his own negligence. Culbertson v. Railroad, 140 Mo. 61; Turner v. Railroad, 74 Mo. 602; Weller v. Railroad, 120 Mo. 635; Clark v. Railroad, 127 Mo. 197; Steffen v. Mayer, 96 Mo. 420; Purcell v. Tennent Shoe Co., 187 Mo. 276.

GANTT, C. J.—This is an action for damages for personal injuries commenced in the circuit court of the city of St. Louis. At the close of the plaintiff's case, the circuit court gave a peremptory instruction to find for the defendant and a verdict was accordingly returned. After an unsuccessful motion for a new trial, the cause was appealed to this court.

The petition alleges the incorporation of the defendant, and charges that it was engaged in the business of manufacturing street cars, and in carrying on its business it maintained large sheds, yards and railroad tracks, both in the yards and in the sheds, wherein cars were kept standing until they were ready to be taken out and delivered to purchasers; that for the purpose of moving the cars from place to place in the yards and sheds, the defendant had a crew known as a switching crew, composed of a motorman and switchman; that the motorman ran what was known as a dummy, which was in fact an electric car, and that it was the duty of the switchman to give proper signals to the motorman, and it was the duty of the mortorman to start and stop the dummy on receipt of these signals; that in addition to having the duty of signaling to the motorman, the switchman was intrusted with the duty of coupling this dummy engine to new cars when they were ready to be taken out of the sheds, and

209 Sup.—10

to see that other cars standing upon the same track with the one which was to be moved were not coupled thereto before giving the signal to the motorman to start the dummy, after it was coupled to the car which the switching crew undertook to move.    It is further alleged that it was a part of the duty of the switchman to see that the cars standing upon the same track as the ones to which the dummy was coupled, which cars were to be left on the said track, had their wheels properly blocked to prevent them from moving when the car to which the dummy was attached, was pulled away.    It is also alleged in the petition that the motorman and switchman were under the direct supervision and orders of the general superintendent of the defendant. The petition then proceeds to state that at the time of the accident and for a long time prior thereto, the plaintiff was a painter by trade, and was employed by the defendant to paint cars in this said plant, and to do other work necessary in and about the finishing of the cars; that plaintiff was engaged in a different department of service from the switchman and motorman and was a member of what was known as the paint gang, under the direction of the paint foreman, who had no authority whatever over the motorman and switchman; that on the 12th day of March, 1903, plaintiff had climbed upon a scaffold or trestle erected by the side of a new car, which was standing on one of the tracks in the defendant's sheds, and was at the time engaged in removing surplus putty from the edges of the windows on the outside of said new car; that while so engaged working upon the said car, there was another new car on the same track directly in front of the one upon which the plaintiff was working and was so close to it that the ends of the two cars touched each other, and they were fastened together in some manner, which was and is still unknown to the plaintiff, but plaintiff did not know at the time that they were so fastened to-

gether; that while plaintiff was so engaged at his work, the switching crew came in with the dummy and coupled to the car standing on the same track immediately in front of the car upon which plaintiff was working; that the switchman, after having coupled the dummy to the car in front of the one on which plaintiff was working, negligently gave to the motorman the signal to start said car in motion. without having unfastened said car from the one upon which plaintiff was working and without having used ordinary care to see that it was not attached to the car upon which plaintiff was working. It was further alleged that the switchman on said occasion negligently failed to block the wheels of the car upon which plaintiff was working so as to prevent it from moving, and negligently failed to warn plaintiff of his intention to move the said car, which he was about to move, as was his duty to do. It is also alleged that the defendant negligently failed to provide plaintiff with a reasonably safe place in which to work, and negligently failed to provide for his safety, in that the defendant, through its said switchman, carelessly and negligently gave the signal to the motorman to start the dummy in motion and negligently caused the car upon which plaintiff was working to be moved while plaintiff was working upon the same, and negligently failed to warn the plaintiff of his intention to move the said car and negligently failed to block the wheels of the car upon which plaintiff was working, and that the motorman started the dummy in response to the signal from said switchman, putting in motion the car to which the dummy was coupled, and that the said car when it moved forward pulled with it the car upon which plaintiff was working so that the step of the car, upon which plaintiff was working, was caused to strike the support of the scaffold upon which plaintiff was working, and knocked the same down, throwing the plaintiff off, and injuring him severely. The pe-

tition then closed with a description of the plaintiff's injuries and the damages he had sustained and a prayer for judgment in the sum of fifteen thousand dollars together with the costs of the case.

The answer was, first, a general denial; second, a plea of contributory negligence on the part of the plaintiff; and, third, that any injuries sustained by the plaintiff were caused by the act of a fellow-servant of the plaintiff, and plaintiff assumed the risk of any negligence on the part of such employee or employees. The reply was a general denial of the new matter set up in the answer.

The evidence on the part of the plaintiff tended to prove that for some time before his injury, he had been employed as a car painter by the defendant in its car works, under a man by the name of Mehlin, who was the general paint foreman, having authority to hire and discharge men working as painters, about one hundred and fifty of whom worked at the plant; that on the day he received the injuries of which he complains, the plaintiff was directed by his superior in the paint department to work on the new car standing in one of the sheds; that in order to reach the windows from the edge of which he was ordered to remove the surplus putty, it became necessary for him to erect a little scaffold; that he placed the trestles supporting the scaffold as best he could, not having a very good opportunity to place them on account of a pile of old scrap iron which was in the way; that as it was placed the trestle supporting the scaffold was near the side of the car, and as it afterwards turned out, it was too near to allow the step of the car to clear it if the car was moved, but plaintiff was not expecting the car to be moved, as it was not finished. That he had been at work about three-quarters of an hour, and while working on this car, it was suddenly pulled away and he was knocked down and fell on a pile of iron and received a

broken arm and his side was badly bruised and he suffered a fracture of the skull. The plaintiff himself testified further that there were five cars out on the tracks that were to be shipped that day, two on the north or inclined track, and three on the track south of the inclined track. The car on which plaintiff was working was standing east-and-west, and the car coupled on to it in front of this car stood in a sort of northeast position. There was a dummy car used as an electric locomotive in charge of a motorman named Fokerst and a switchman named Hensler; that this switching crew was not under the direction of the paint foreman, plaintiff's boss, and he had nothing to do with them. The plant was a very large one and employed a large number of men in its various departments. One of the witnesses estimated the number of men employed at 2,500, others said from 1,000 to 1,500 at a time. The testimony also tended to show that when the general superintendent wanted any cars taken out of the sheds, he sent this switching crew to any part of the yards where the cars might be, and that it had been the universal custom, before any car was moved in the sheds, for the switchmen to walk around the car, see that any car standing immediately behind it was blocked so that it could not move forward, and see that it was clear so that the car to which the coupling was made would not pull it along as it started out, and if any workman was engaged in working upon the car to notify and warn him of his intention to move the car. The evidence further tended to show that the workmen engaged in working upon these cars relied upon this custom and paid no attention to the movements of the dummy, unless directed by the switchman to look out. The evidence further tended to show that the car upon which plaintiff was working was so situated that a car immediately in front of it standing upon a curve, concealed the plaintiff from the switchman as he ap-

proached with the dummy; that the switchman coupled the dummy immediately in front of the one upon which plaintiff was working and neglected to give any warning or to ascertain whether or not any of the men were so situated that they might be injured by moving the car, and neglected to see whether the car to which the dummy was coupled was fastened in any manner to the car upon which plaintiff was working, and neglected to see that the wheels of the car upon which plaintiff was working were blocked, which last precaution was necessary in this case, from the fact that there was a slight down grade from the place where the car upon which plaintiff was working stood toward the dummy. When the dummy started in some manner it pulled with it the car upon which plaintiff was working and the step of the car upon which plaintiff was working struck the support of the plaintiff's scaffold and plaintiff was thrown off and severely injured. It is true that the witness Hensler, defendant's switchman, who was called by the plaintiff as a witness, testified that the car upon which plaintiff was working lacked a little bit of touching the car to which he coupled, but a number of other witnesses testified positively that the two cars were touching each other. The importance of the switchman taking all the precautions alleged to have been necessary, and which the evidence tended to show he failed to take, was shown by the fact that the men frequently worked under the cars attaching pipes and apparatus for the air brakes, worked on scaffolds adjoining the car on the outside, and also worked inside of the cars. The plaintiff testified that at the time of his injuries he was working on the south side of the car and the dummy came from a northeast direction; that no warning whatever was given him that the car was about to be moved. On cross-examination, he stated that he placed his carpenters' horse, upon which his scaffold was resting, in position himself; that he did

not notice the steps at the end of the car and so arrange
the horse that if the car started it would not hit the
horse, because they had always warned him to look out,
and he had no thought that the car was to be pulled
out.

I. The rule is firmly established in this State that
a demurrer to the evidence admits every fact which
the jurors may infer if the evidence were before them
and should be sustained only when the evidence thus
considered fails to make proof of some essential aver-
ment. [Rine v. Railroad, 100 Mo. 228; Myers v. Kan-
sas City, 108 Mo. 480; Franke v. St. Louis, 110 Mo.
516; Moore v. Railroad, 194 Mo. 1, l. c. 9; Bender v.
Railroad, 137 Mo. 240.]

Were the plaintiff and the switchman, whose alleg-
ed negligence in pulling out the car to which the un-
finished car on which plaintiff was working was attach-
ed, without warning to the plaintiff, thereby causing
plaintiff's injuries, fellow-servants so as to exempt the
defendant from said negligent act? We all agree that
the rule which exempts the master from liability to one
servant from the negligent act of a fellow-servant pre-
vails in this State, but we think it must be conceded
that the broad and sweeping rule announced in Far-
well v. Railroad, 4 Metc. (Mass.) 49, has not met the
approval of this court in many cases. As said by Judge
BLACK in Parker v. Railroad, 109 Mo. l. c. 407, that
rule "had but little more than been approved when
courts and legislatures began a process of cutting it
down because of the gross injustice which it worked
out in its application to the great enterprises of the
day." On the other hand, what is known as the de-
partment rule has not been adopted in this State in all
of the broadness for which many of its advocates have
contended. Much of the difficulty has arisen from the
inability of the courts to determine at all times whether
the employment was a common service and the employ-

ees fellow-servants within the meaning of the rule itself. We are aware that it is insisted that the courts ought to be able to so express the rule that all cases can be weighed and gauged by it. But we are of the opinion, after long consideration, that unsatisfactory as it might seem, the rule itself must remain *general* and its application *specific* as the cases arise. The subject was given great consideration in Parker v. Railroad, 109 Mo. 362. In that case, contrary to the views of the present writer, this court refused to hold that a railroad locomotive engineer and a track-walker in the service of the same company were fellow-servants within the rule exempting masters from liability for injuries received through the negligence of a fellow-servant. Afterwards when the same question arose in Schlereth v. Railroad, 115 Mo. 87, this court In Banc, through BURGESS, J., approved the opinion of Judge MACFARLANE in Division, in which he said: "The importance of having the rules of law firmly established, especially those under which property rights are held, or the business and wages of large classes of citizens are made to depend, is fully recognized, and we therefore hold in accordance with the late rulings of this court that the husband of plaintiff [the track-walker] was not a fellow-servant of the negligent engineer within the rule of exemption. [Sullivan v. Railroad, 97 Mo. 113.]" In the last-cited case it was ruled that a track-walker on a railroad is not a fellow-servant of the locomotive engineer or fireman of a passenger train. In Condon v. Railroad, 78 Mo. 567, it was ruled that a car repairer at a station and a trainman were not fellow-servants within the meaning of the rule. And in Hall v. Railroad, 74 Mo. 298, it was held that a section foreman and a switchman were not fellow-servants. In Dixon v. Railroad, 109 Mo. 413, a quarry laborer under orders of a foreman, who had control of the quarry and represented the company, was not a fellow-servant

with the trainmen on a passenger train. All of these cases were cited with approval and followed by this court In Banc, in Lanning v. Railroad, 196 Mo. 647. In this last-mentioned case it appeared that the plaintiff was a workman engaged as a part of a crew emptying cars of coal into bins at a coal-chute and was injured by the negligence of an engineer in backing some cars up an incline and causing them to strike the car on which plaintiff was working. The crew in which plaintiff worked had its own foreman from whom he took his directions and the engineer worked under the general supervision of the yard-master, and it was held that the plaintiff and the engineer were not fellow-servants, this court saying: "We think that the workmen so distantly related to each other in the service of a common master as plaintiff and Gahagan were, were not fellow-servants within the meaning of the rule which exempts a master from liability for injuries inflicted by a fellow-servant upon a fellow-servant. . . . in our opinion the reason of the rule forbids its application to the facts in this case."

When we look for the underlying principle upon which all of these cases rest as exceptions to the general rule announced in Farwell's case, it will perhaps be found as well stated in the separate opinion of Judge BLACK in Parker v. Railroad, 109 Mo. l. c. 409, as anywhere. As that rule prevailed in that case, it will bear repeating here: "Now, it being conceded, as it must be, that the master is liable to third persons for the negligent acts of his servants, it is difficult to see how public policy has much to do with the question as to who shall be deemed fellow-servants within the rule of exemption. The liability being admitted in case a third person is injured, but denied in case a servant is injured by another servant, the denial in the latter case must stand on some peculiar relation between master and servant. This peculiar relation cannot be simply

the fact that the servants are in a position where one may be injured by the negligence of another, for third persons often occupy the same position; as where they become passengers. The real and only point of distinction, it seems to us, arises out of the fact that servants are so associated and related in the performance of their work that they can observe and influence each other's conduct, and report any delinquency to a correcting power. To say a clerk engaged in an office, making out pay rolls for a railroad company, is a fellow-servant, within the rule of exemption, with those engaged in operating trains, is out of all reason. Guided by the real reason for the rule, it seems to us it should be applied and applied only in those cases where the servant injured and the one inflicting the injuries are so associated and related in their work that they can observe and have an influence over each other's conduct, and can report delinquencies to a common correcting power or head. In short, they should be fellow-servants in fact, and not simply in dialectic theory. If in separate and distinct departments, so that the circumstances just stated do not and cannot exist, then they are not fellow-servants within any just or fair meaning of the rule. This conclusion, though not in strict accord with the majority of the adjudged cases, is, it is believed, within the true and only reason for the rule, and has the support of many cases, some of which go much further than has been indicated.'' Now in the case at bar, we have seen that the plaintiff belonged to a gang of painters who were working under a general paint foreman, Mehlin, who had authority to hire and discharge them and to direct their work. This foreman had no power or authority over the switching crew, to which the switchman, Hensler, belonged, but the latter worked under the directions of the general superintendent of the whole works, who when he desired a car taken out of the yards or sheds to be ship-

ped, sent his switching crew with the motor for that purpose. The plant, as the evidence all shows, was a very large one and a very large number of workmen were employed therein. The plaintiff was employed in the construction of cars, while the switching crew were engaged in an entirely different branch of the work, to-wit, the transportation or movement of the cars. In a word, these painters were not so associated or related with the switching crew that they were required to observe and report any delinquencies on their part, and unless we are to disregard the decisions which we have cited, especially the Lanning case, the conclusion cannot be escaped that the plaintiff and the switching crew were not fellow-servants within the meaning of the exception which we have just noted to the general rule exempting masters for the negligence of their servants.

But it is said that while those cases may have been properly decided they were all rendered in railway cases and the doctrine should not be extended to any other class of masters, and we are cited to a sentence in the opinion of Judge BLACK in the Parker case, in which he says: ''Thus, the persons engaged in and about machine shops, foundries and the like are often strictly fellow-servants, though under and subject to the orders of different foremen.'' But this view ignores the other remarks of the learned judge in the beginning of that paragraph where he says that the general rule had been cut down by the courts ''because of the gross injustice which it worked out in its application to the great enterprises of the day.'' We agree that servants of a common master working under different foremen, may be brought into such consociation and relation to each other that they would still be held to be fellow-servants within the meaning and modification of the general rule which was announced by Judge BLACK in Parker's case, but we are unwilling to say

that the underlying reason of the decisions in the cases
we have cited would restrict the rule to railroads alone.
The reason of the law is the life of the law, and where
a master is operating a great enterprise which calls for
various departments in the execution of his work,
whether it be a railroad or, as in this case, immense
car works for the manufacture and construction of
cars, requiring various and distinct branches of labor,
he is equally within the rule.   The same reason which
applied to the owner of a railway must be held appli-
cable to other large manufacturing plants of business.
But we are cited to the decision of this court in Grat-
tis v. Railroad, 153 Mo. 380, in which the departmental
doctrine is strongly criticised by Judge MARSHALL, in
which decision the majority of this court, including the
writer hereof, concurred, but a careful examination of
that case will show that the final conclusion was that
the engineer and fireman on the train in that case were
fellow-servants, and that the negligence of the engin-
eer was the sole cause of the injury to the fireman, and
that the master was not liable for the negligence of the
engineer.   It is true that Judge MARSHALL makes an
extended review of the cases on this subject, but none
of the cases which we have cited were overruled.   In 2
Lewis's Sutherland on Statutory Construction (2 Ed.),
section 486, it is aptly said: "The maxim of *stare
decisis* applies only to decisions on points arising and
decided in causes; it has been held not to extend to
reasoning, illustrations and references in opinions.
The precedent includes the conclusions only upon ques-
tions which the case contained, and which were decided.
'The members of a court,' says DOWNEY, C. J., 'often
agree in a decision, but differ decidedly as to the rea-
sons or principles by which their minds have been led
to a common conclusion. It is, therefore, the conclusion
only, and not the process by which it has been reached,
which is the decision of the court, and which has the

force of precedent in other cases.'" So viewed, the decision in the Grattis case did not overturn any of the decisions which we have cited for the purpose of showing what the views of this court have been as to who are and who are not fellow-servants in this State.

In our opinion, the plaintiff was not a fellow-servant with the switchman, whose negligent act, the evidence tended to show, was the cause of the plaintiff's injuries, and if the court sustained the demurrer to the evidence on the ground that the switchman and plaintiff were fellow-servants, as is asserted by plaintiff, then it committed reversible error.

II.   But there is another view upon which the plaintiff was entitled to have his case submitted to the jury. It is the duty of the master to provide and maintain a reasonably safe place for his servant to work. [Wendler v. Furnishing Company, 165 Mo. 527; Herdler v. Stove & Range Co., 136 Mo. 3; Moore v. Railroad, 85 Mo. 588; Curtis v. McNair, 173 Mo. 1. c. 280; Purcell v. Shoe Co., 187 Mo. 1. c. 285.]

When then the defendant, through the paint boss, Mehlin, sent the plaintiff to work upon the unfinished car, on one of its tracks, it was its duty to provide against other cars running down against the car upon which he was working and to see that other cars which were pulled out were not attached to the car upon which he was working without giving him warning of its intention to move the said car. While the servant in entering the service of the master assumes the risks that ordinarily and usually are incident to the business being conducted by the master, the servant does not assume the risk arising from the master's neglect to adopt suitable precaution for his safety. The duty of the master in this regard is a continuing one and it will not suffice to say that when plaintiff went to work on the car it was a reasonably safe place. If the place was afterwards rendered unsafe by the negligent act

of the defendant in sending a switching crew in there
who negligently pulled the car upon which plaintiff
was working without giving him warning of their in-
tention to move it, then defendant was liable for the
consequence of the negligent act of the switchman. The
plaintiff had the right to presume, in the absence of
knowledge to the contrary, that the defendant would
furnish him a reasonably safe place to work and that
he would not imperil his safety by sending its servants
in there to move the car upon which he was working
without notifying him. [Doyle v. M. K. & T. Trust
Co., 140 Mo. 1.]

But it may be said that the switchman was not the
vice-principal of the defendant in moving and direct-
ing the car to be moved whereby plaintiff was injured.
On this point this court in Moore v. Railroad, 85 Mo.
588, approved the doctrine laid down by Wood on Mas-
ter and Servant, page 860, as follows: "Whenever the
master delegates to another the performance of a duty
to his servants, which the master has impliedly con-
tracted to perform in person, or which rests upon him
as an absolute duty, he is liable for the manner in which
that duty is performed by the middle man whom he has
selected as his agent, and, to the extent of the discharge
of those duties by the middle man, he stands in the place
of the master, but as to all other matters he is a mere
servant." In that case, the plaintiff, Moore, was
employed as a car repairer, and he was ordered by his
foreman to repair the draw-head of one of the freight
cars of the defendant company then standing with other
freight cars upon the side track of the defendant, and
was promised by the foreman that he would protect him
while he was so employed in repairing the draw-head.
Relying on the promise of the foreman, Moore under-
took to repair the draw-head and while engaged thereat,
an engine of the defendant came down upon the said
side track and against the car standing thereon, and the

car upon which plaintiff was at work was driven back
against the freight car standing in the rear thereof and
plaintiff's right arm was cut and crushed between the
same. Judge HENRY, speaking for this court, said: "It
was the duty, a contractual obligation, of the company
to provide for the safety of the men at work in repair-
ing the car. The company devolved that duty upon the
person who represented it in conducting, ordering and
managing the work, and the men engaged in it. It could
not impose that duty upon the car repairers so as to
absolve itself from liability for its own negligence. It
might make reasonable rules and impose the duty upon
the servants to observe those rules for their own
safety." Accordingly, it was held that the plaintiff
was entitled to recover on the ground of the failure of
the defendant to provide for the safety of the plaintiff.
In Dayharsh v. Railroad, 103 Mo. l. c. 575, it was said
by this court: "A person employed to perform any of
the master's duties towards his servant is, while that
relation continues and in respect to such duties, no fel-
low-servant of the latter. The duties which the master
owes a servant may, in many particulars, be delegated
to subordinates, and the wide extent of modern busi-
ness enterprises often necessitates so doing; but that
delegation of authority does not not relieve the master
from a proper discharge of those duties." In that case
a "night hostler" backed an engine upon the plaintiff,
who was at work in an ash-pit under the track. It was
earnestly contended, in that case, that because the
"night hostler" had control and direction of the men
necessary to assist him in the round-house, he was a
fellow-servant, because, in the actual backing of the
engine, he was doing the work of a servant, and was
not acting in his capacity as a boss over the men; but
this court said: "If he had expressly directed the en-
gine to be moved down by another upon the plaintiff,
in the manner described in the evidence, the defendant

would have been responsible for the act, and we are unable to perceive any logical or reasonable distinction between so directing it and his performing such negligent act himself, in the circumstances here shown. It was one which fell within his authority as the master's representative to direct, and it can make no difference in principle whether he did it personally or by another . . . where his act involved an obvious breach of the master's duty to use care to provide a reasonably safe place for the plaintiff to work.'' And it was held that the hostler's negligence was ascribable to the master. The ash-pit in that case, as was the car track in the Moore case, and the car track in this case, were each safe enough in themselves, but each was rendered unsafe by the acts of the servants of the company in moving their cars and engines against and over the place where the injured servant was at work.

The danger of pulling this car upon which plaintiff was at work, without warning the plaintiff, is apparent from a statement of the facts, but the testimony in this case went further and tended to prove that it was the duty of the defendant's switchman, who was entrusted with the work of moving cars, to give the painters warning and see that no car was moved without affording them an opportunity to look out for their safety. Obviously it was a personal duty of the defendant to the plaintiff not to move the car without such warning, but the performance of this duty was entrusted to the switchman and the fact that the switchman was not a servant of high degree does not change or effect the responsibility of the defendant for the negligent manner in which that duty was performed. The act of the switchman was the act of the defendant itself.

The views we have expressed have been approved in many other jurisdictions, notably in Railroad v. Fox, 31 Kan. 586; Railroad v. Hinzie, 82 Tex. 623; Railroad v. Triplett, 54 Ark. 289. We think the testimony

on this branch of the case required the court to submit
the question of the defendant's negligence to the jury
under proper instructions, and for this reason also the
demurrer to the evidence should not have been sus-
tained.

III. As to the plaintiff's contributory negligence,
we think it is obvious that the court had no right as a
matter of law to declare that the plaintiff's own negli-
gence would bar his recovery. It was a question that
should have been submitted to the jury under proper
instructions. As to the defense of assumption of risks,
what we have already said sufficiently indicates our
view as to that. Certainly the evidence was not such as
would have justified the court in taking the case from
the jury.

The judgment is reversed and the cause is remand-
ed for a new trial in accordance with the views herein
expressed. *Burgess, J.,* concurs in the first and third
paragraphs; *Fox J.,* in the first and third, but expresses
no opinion on the second; *Valliant, Lamm* and *Wood-
son, JJ.,* concur *in toto;* and *Burgess* and *Graves, JJ.,*
dissent as to the second, and *Graves, J.,* generally.