JAMES E. TODD, Respondent, v. AMERICAN RAILWAY EXPRESS CO. and C. R. TREADWAY, Defendants, AMERICAN RAILWAY EXPRESS COMPANY, Appellant.*

Kansas City Court of Appeals. May 15, 1925.

1. **TRIAL PRACTICE:** Demurrer: In Passing upon Demurrer, Plaintiff's Evidence and All Reasonable Inferences Favorable to Cause of Action Must be Accepted as True. In passing upon a demurrer to the evidence, court must accept as true testimony of plaintiff and all reasonable inferences to be derived therefrom must be viewed in light most favorable to cause of action.

2. **MASTER AND SERVANT:** Negligence: Testimony Held Admissible to Show Notice of Dangerous Disposition of Horse. In an action for injuries to plaintiff as result of being kicked by horse, evidence that barn foreman of defendant told witness to put horse in a

stall where he would not have to lead horses by him and to keep a rope across rear of stall because he would kick, *held* admissible for purpose of showing notice of his dangerous disposition.

3. ———: ———: Whether Custom of Placing Rope Behind Horse Was to Keep Him from Kicking, Was Held for Jury. Whether custom of placing rope behind horse was to keep him from kicking, or from backing out into aisle, *held* for jury.

4. ———: ———: Fellow-servant: Whether Failure to Place Rope Behind Horse in Stall Was Act of Fellow-servant, Held for Jury. Whether failure to place rope behind horse, across rear of stall, to keep him from kicking was act of fellow-servant because duty of tying rope was simple duty incident to servant's employment which master could delegate, *held* for jury in view of testimony that barn foreman had taken rope for another purpose and had not returned it.

5. ———: ———: Whether Failure to Place Rope Across Stall to Prevent Horse from Kicking Was Negligence, Held for Jury. In an action for injuries to employee kicked by horse, question whether failure to place rope across rear of stall to prevent horse from kicking, was negligence, *held* for jury.

6. INSTRUCTIONS: Instruction Held Not Objectionable as Telling Jury That Failure to Tie Rope Behind Dangerous Horse Was in and of Itself Negligence. An instruction submitting issues as to whether horse was dangerous, whether defendant knew or could have known it was dangerous, and whether it was customary to tie a rope behind him, and telling jury that if defendant negligently failed to tie rope across rear end of stall and ordered plaintiff to work in close proximity to horse without warning, *held* not objectionable as telling jury that failure to thus provide rope was in and of itself negligence.

7. ———: Where Act of Foreman in Taking Rope Was Act of Master, it Was Unnecessary That Defendant Have Notice of Absence of Rope. Where the act of barn foreman in taking rope, customarily placed across rear of stall to prevent horse from kicking, for another purpose and failing to return it, was the act of the master, it was unnecessary to entitle plaintiff to recover that instruction submit question whether defendant had reasonable notice that rope was not in its proper place.

8. ———: Refusal of Defendants Instruction as to Its Duty to Provide Safe Place to Work, Held Proper as Omitting Elements of Negligence Contained in Pleadings and Proof. Refusal of defendant's instruc-

tion that if defendant exercised ordinary care to provide plaintiff with a reasonably safe place in which to work, finding should be for defendant, *held* proper as directing a verdict without submitting therein elements of negligence contained in the pleadings and proof.

9. **APPEAL AND ERROR:** Courts Loath to Disturb Verdict Unless so Grossly Excessive as to Shock Judicial Conscience and Show Passion and Prejudice of Jury. Appellate courts are loath to disturb verdicts unless the amount is so grossly excessive as to shock the judicial conscience and to show the result of passion and prejudice on the part of the jury, but will defer largely to findings of jury and rulings of trial court in this respect.

10. **DAMAGES:** Verdict for $5000 for Injuries to Kidneys and Groin Held Not Excessive. Where plaintiff, as result of being kicked by a horse, received serious injury to kidneys, suffers pain and has low blood pressure and swelling in left groin, verdict of $5000 *held* not excessive.

*Corpus Juris-Cyc. References; Appeal and Error, 4 C. J., p. 872, n. 19. Damages, 17 C. J., p. 1100, n.ʼ 27. Master and Servant, 39 C. J., p. 438, n. 12; p. 1030, n. 20; p. 1138, n. 71, 72; p. 1177, n. 30. Trial, 38 Cyc., p. 1543, n. 69; p. 1633, n. 12; p. 1663, n. 28.

Appeal from the Circuit Court of Jackson County.— *Hon. Charles R. Pence,* Judge.

AFFIRMED.

*Harry G. Kyle* and *Walter A. Raymond* for respondent.

*Lathrop, Morrow, Fox & Moore* and *George J. Mersereau* for appellant.

ARNOLD, J.—This is an action for personal injuries alleged to have been sustained by plaintiff as a result of being kicked by a horse owned by defendant Express Company, while plaintiff was in the employ of said company. Defendant Treadway was employed as superintendent of a barn owned and operated by defendant

company and was in charge of the men there employed. A demurrer was sustained as to defendant Treadway and judgment rendered against the Express Company, appellant herein, and which will be hereinafter referred to as the defendant.

In the course of operating a general express business in Kansas City, Mo., defendant uses a large number of horses and wagons which are housed in a two-story barn located at the northwest corner of 19th and Central streets in said city, and employs a number of men in and around said barn. Plaintiff, a common laborer, aged about thirty-seven years, entered the employ of defendant in June, 1920, and was assigned to duty on the first floor of said barn as a wagon washer and continued at this work until the 15th or 16th of July, 1921, when he was changed from that job and transferred to the second floor where the horses were kept and was there put to work as a groom, i. e. taking care of a string of horses, watering, feeding, bedding, cleaning, harnessing and unharnessing them. It appears this assignment was temporary and that plaintiff later was assigned to a different string of horses, taking the place of James Allen, one of the regular grooms, who was on a vacation. Allen's hours were from 11 p. m. until 8 a. m. and his string of horses which plaintiff was to care for consisted of eighteen head, some being on one of the aisles running north and south, and all of those whose heads, when in their stalls, were against the south wall of the barn and south of an aisle running east and west, about four feet in width. Near the southeast corner of the barn and just north of said aisle was a watering trough where the horses were taken for water, and in this process they were led along the four-foot aisle, behind the horses which were in their stalls with their heads to the south wall. The fourth of these stalls from the east wall was regularly occupied by a horse named "Sonny" but commonly known as "Jeff," a large animal weighing about 1400 pounds. There were stalls al-

so on the north side of the aisle in question. At the southeast corner of the building there was a box stall and Jeff's stall adjoined it on the west. The watering trough occupied the space on the north side of the aisle but did not set out in the aisle, so that in leading the horses to water, it was necessary to lead them through this aisle, past Jeff's stall, in order to reach the trough. The testimony shows that Jeff's stall was the same depth as the other stalls located along the south wall of the building, but that there was a pillar against the wall at his head so that there was not sufficient room for a hay-rack high up as in the other stalls, and it was fixed to this pillar. The horse could not feed in comfort from this rack without stepping back, and this Jeff was in the habit of doing.

Plaintiff had had this particular string of horses in charge for only two or three nights when the accident occurred in the early morning. The testimony shows that plaintiff was unacquainted with the peculiarities and proclivities of any of these horses, including Jeff. There is testimony tending to show that plaintiff was reared on a farm until he was practically of age, but he had had little experience in handling horses; that he had left the farm about the time he attained his majority and thereafter was engaged in other employment not re-quiring the handling of horses.

Early in the morning of August 23, 1921, the day of the alleged injury, plaintiff had led a horse to the water-ing trough and was returning along the aisle when, on reaching the rear of the stall in which Jeff was tied, he was kicked in the stomach and left groin, the force of the blow knocking him against a stall on the north side thereof, and causing serious and permanent injuries.

Defendants filed demurrers stating the petition failed to state a cause of action. As we have said above, the demurrer of defendant Treadway was sustained and that of the Express Company was overruled. Thereupon the

Express Company filed its amended answer making general denial and alleging contributory negligence of plaintiff and assumed risk.

The reply was a general denial. Thereafter the Express Company specially appeared and filed motion for removal of the cause to the United States District Court in and for the Western District of Missouri, alleging adverse citizenship as the basis therefor. The motion was overruled and the cause went to trial to a jury, resulting in a verdict for plaintiff in the sum of $5,000. Motions for new trial and in arrest were overruled and judgment was entered in accordance with the verdict. Defendant appeals.

It is charged the court erred in overruling defendant's demurrer at the close of all the evidence. The negligence charged in the petition tersely stated, is as follows: (1) Failure to furnish plaintiff a reasonably safe place to work after defendant knew of the unsafe condition, to-wit, a dangerous horse; (2) failure to put a rope across the rear of the stall; and (3) failure to warn and instruct plaintiff relative to the danger in working near the horse in question. It is argued that the record, considered in connection with these charges of negligence, fails to show sufficient evidence to send the case to the jury, and that it is not shown that Jeff was a dangerous horse.

This point necessitates some inquiry into the history of the horse, in an effort to learn whether or not there was any substantial evidence that the horse was dangerous. It is agreed this horse was one of a pair purchased November, 1915, by the American Express Company, known as "Sonny and Jeff," and that they were kept in a barn at Third street and Broadway. Of this pair the horse "Sonny" is the one involved in this suit. He was five or six years old at the time of the purchase. The other horse, "Jeff" was shipped to Ada, Oklahoma, on November 23, 1919, and "Sonny" thereafter

was known as "Jeff and was mated with another horse named "Sporty" and was used in the business of defendant, American Railway Express Company, which succeeded to the property and business of the American Express Company in July, 1918.

At the time of the purchase of "Sonny and Jeff," in 1915, the stable of the American Express Company was under the general supervision of Treadway at the company's barn at Third and Broadway, and upon consolidation of the express companies, the horses at Third and Broadway were moved to Nineteenth and Central streets, Treadway remainiing in charge thereof. Treadway, therefore, was in general charge of "Jeff" from the time of his purchase in 1915, until the date of the injury.

Charles Lindsey, one of plaintiff's witnesses, testified that he was a driver for the American Railway Express Company in 1918, upon the consolidation; that he drove the team known as Sporty and Jeff, the latter being the horse in question herein; that Jeff was balky and that he was bad about kicking at other horses when they were led behind, or brushed against him; that he would kick on these occasions with one or both feet. George DeBow, also in defendant's employ, a witness for plaintiff, testified he was acquainted with the horse Jeff and that he had seen him kick at other horses on a few occasions. Joseph D. Maddox, a witness for plaintiff and one of defendant's drivers, testified that he first knew the horse Jeff at Third and Broadway and at that place he stated "he got loose from me once and kicked around over the barn," and that was about all the trouble he had with him. He stated "he would run and kick, would kick and fight the other horses as soon as he got loose." He stated that the horse also got loose at the barn at Nineteenth and Central and ran all over the barn, upstairs, and kicked and ran down stairs and back up, and that he had to get some men "to help get him back

in the stall;'' that he had seen him kick at other horses when the rope was tied behind him.

There is nothing in this evidence that tends to show that Jeff kicked at men, but unquestionably does show that he would, and did, kick and fight other horses. The charge is not that Jeff was a vicious horse, but that he was dangerous. Webster defines *dangerous* as ''attended or beset with danger; full of risk; causing danger; likely to harm; perilous; hazardous, unsafe.''

The rule will not be controverted that in passing upon a demurrer the court must accept as true the testimony of plaintiff and all reasonable inferences to be derived therefrom must be viewed in the light most favorable to the cause of action. Defendant insists that although the testimony may tend to show a dangerous disposition of the horse, yet there is not sufficient evidence that such disposition was known to the master, or that it could have been known to him by the exercise of ordinary care, and was not known to the servant and that the master failed to warn the servant.

The testimony of Maddox is to the effect that one Jake Ducate was barn foreman for the American Express Company at Third street and Broadway at the time Jeff was brought there, and that he was in charge of a string of horses which included Jeff; that Ducate told the witness that Jeff was a bad horse and would kick, and instructed witness to put Jeff ''where he would hurt nobody and kick no horses.'' Maddox was asked:

''Q. When he (Ducate) told you this was a dangerous horse, did he tell you where to put him in the barn at Third and Broadway? ''A. Yes, sir, told me to put him where we wouldn't have to lead horses by him, that he would kick.

''Q. What else did he tell you about how you should place him in the stall? A. Put him in the stall and keep a rope behind him.''

This testimony was received by the court over the objections of defendant, the court stating that its admis-

sion was for the purpose of showing notice of the dangerous disposition of the horse. This was proper. This witness also testified that Jeff was taken to the barn at Nineteenth & Central, that witness had been working at that barn for several months prior to the accident, and that when he went there he was placed in charge of a string of horses of which Jeff was one; that the superintendent of the barn at that place was "Doc" Treadway, and that Jerry Kellerher was barn foreman; that Jerry told witness on the occasion when Jeff got loose at the Nineteenth & Central barn, "Doc" said not to let that horse get loose any more, he was dangerous and liable to hurt somebody.

The testimony further shows that "Doc" Treadway, the superintendent, went through the barn every morning and looked at the horses, and that he had had Jeff under his supervision ever since his purchase in 1915, and because of Jeff's tendency to kick, it was customary to keep a rope behind him to keep him from kicking. There was testimony in defendant's behalf tending to show that the purpose of placing the rope behind the horse was to keep him from backing partly out into the aisle. But the evidence of plaintiff is substantial that the purpose of the rope was to keep the horse from kickiing. In considering the demurrer, we must consider the latter version as being correct to the effect, at least, that one of the reasons for the rope was to prevent the horse from kicking. A rope was not placed behind any other horse in that string. The jury reasonably could draw such an inference.

It is in evidence that the grooms at the barn at Nineteenth and Central streets worked in two shifts, one in which witness Maddox worked, was from 8 a. m. to 11 p. m. and the other from 11 p. m. to 8 a. m. Plaintiff was working temporarily in the latter shift, during the absence of Allen, the regular groom. It was the duty of Maddox to bed the horses at night and to place the rope across the stall behind Jeff.

On the night preceding the accident Maddox failed to place the rope behind Jeff and in the morning when plaintiff led another horse through the aisle at the rear of Jeff's stall, the injury occurred. The failure of Maddox to place the rope behind Jeff is explained by the witness as follows: That the day before the occurrence in question the barn foreman, Jerry, had used the rope in question for the purpose of tying up a horse's head while the horse was being sheared; that the rope was not returned and Maddox, not finding the rope, left Jeff without a rope behind him.

It is urged by defendant that the failure to place the rope behind Jeff on this particular night was the act of a fellow-servant, and therefore plaintiff cannot recover, because the duty of tying the rope behind Jeff was one of those intermediate, ordinary and simple duties incident to the servant's employment which a master could delegate to the servant, under the law, and thus relieve himself from liability for failure to furnish a safe place in which to work,—the failure to place the rope being the sole and efficient cause of the injury. [Card v. Eddy, 129 Mo. 510; Stephens v. Lumber Co., 110 Mo. App. 398; Padgett v. Steele Co., 160 Mo. App. 544; Pippin v. Const. Co., 187 Mo. App. 360; Forbes v. Dunnavant, 198 Mo. 193; Modlagl v. Iron Co., 248 Mo. 587.]

The evidence shows plaintiff was not warned of the dangerous proclivities of the horse, was not told anything about keeping a rope back of his stall, and had no knowledge or information of the danger to be anticipated. It is plaintiff's position that as the petition charges negligence in that defendant failed to furnish him a reasonably safe place in which to work, and the testimony shows the dangerous proclivities of the horse and the narrowness of the aisle adjacent to which Jeff was tied, although the dangerous proclivities of the horse were known to defendant, failure to tie the rope behind Jeff upon the night in question was merely a concurrent act

of negligence in failing to furnish plaintiff a reasonably safe place in which to work.

Defendant contends that concurrent acts of negligence were not pleaded and that the placing of the rope behind Jeff was a simple duty incident to the servant's employment which the master could delegate.

We may readily concede that if the charge of negligence consisted of but one act, defendant's position might be tenable, but under the pleadings and proof the matter of placing the rope is only one of the elements of failure of defendant to use ordinary care to furnish plaintiff a reasonably safe place in which to work. Moreover there is testimony to the effect that the foreman of the barn, Jerry Kellerer, had taken the rope for another purpose and had not returned it. We cannot say therefore that there was no evidence from which the jury reasonably might infer that defendant, and not a fellow-servant, failed to furnish a rope on the occasion of the injury, and that by reason of such failure plaintiff was not furnished a reasonably safe place in which to work.

We have carefully examined the cases cited by defendant upon this proposition and find none of them to be directly in point. In some, the negligent act complained of consisted in failure to perform a duty which had been assigned to the plaintiff, or to a fellow-servant. A situation similar to that here presented is found in the case of White v. Ward & Co., 177 S. W. 1089, decided by this court. In that case the plaintiff was assisting in unloading a car which was standing on a track. It was the duty of one of the men engaged in the work to place a runway in the car door leading to the dock and the runway was so placed that it gave way, the plaintiff fell and was injured. In holding defendant liable, the court used this language (l. c. 1090):

"It is oftener than otherwise that the employer does not himself perform the labor of fixing or constructing a place in or about which his employees are to work. It

is his duty to see that his servants who do the labor do it properly. And it is said by our Supreme Court, and by this court, that, when the master uses another servant in fixing or constructing a place in which other servants are to perform their duties, the former servant, while so engaged, is not a fellow-servant. [Koerner v. St. Louis Car Co., 209 Mo. 141, 158, 107 S. W. 481, 17 L. R. S. (N. S.) 292; Zellars v. Mo. Water Co., 92 Mo. App. 123-127.]''

[See, also, Beck v. Lumber Co., 239 S. W. (Mo. App.) 166; Pyle v. Light & Power Co., 246 S. W. 979.] We see in the case at bar even a stronger case for plaintiff than any of those above cited, in this, that the absence of the rope is shown by the evidence of Maddox to have been due to the negligent act of the barn foreman, Kellerer, in removing and failing to return the rope. In accord with the views above expressed, we must hold there was substantial evidence to warrant submitting the case to the jury, and there was no error in overruling the demurrer of defendant.

Complaint is made of plaintiff's first instruction, the basis thereof being that the instruction told the jury that if defendant, at the time in question, negligently failed to tie a rope across the rear end of the stall, they should find for plaintiff, thereby, in effect, applying the rule of *res ipsa loquitur*. Of course it would have been error for the court to tell the jury that the absence of the rope was in and of itself negligence. The question as to whether such failure to provide the rope at the rear of the stall was negligence was for the jury to determine.

We find, however, the instruction is not open to the objection made. It submits the issues as to whether the horse was dangerous; whether defendant knew it was dangerous or by ordinary care could have known it; whether it was customary to tie a rope behind him; and then told the jury that if they found that at "the time in question the defendant negligently failed to tie a rope

across the rear end of said stall, if so, and that the defendant negligently ordered the plaintiff to work in close proximity to said horse, if so, and that plaintiff did not know that said horse was dangerous, if so, and that the defendant negligently failed to warn plaintiff that said horse was dangerous, if so, and that while plaintiff was working in close proximity to said horse, if so, said horse kicked the plaintiff, if so, and that as a direct result of said kick, if so, plaintiff suffered any injuries, if so, then you should find for the plaintiff, unless you further find and believe from the evidence that the plaintiff was guilty of negligence which directly contributed to his injuries, if any, and unless you find that the plaintiff assumed the risk as hereinafter defined in another instruction.''

''By 'negligence' and 'negligently' as used in this instruction is meant the failure to use ordinary care. By 'ordinary care' as used in this instruction is meant the care which a person of ordinary prudence would have used under the same or similar circumstances.''

Thus it will be seen that the instruction, taken as a whole, does not tell the jury that the failure to tie the rope at the rear of the stall was negligence, but submits the question whether the failure to warn plaintiff was a failure on the part of defendant to exercise ordinary care under the circumstances. [Chambers v. Hines et al., 233 S. W. (Mo. App.) 949; Troutman v. Oil Co., 224 S. W. 1014.] It is insisted the instruction is vitally erroneous because it overlooks the evidence of defendant that the absence of the rope was due to the negligence of plaintiff's fellow-servant, Maddox. As we have passed upon this phase of the case against defendant's contention, we need not discuss it further.

It is also charged as error against the instruction that it fails to submit to the jury the question as to whether defendant had reasonable notice that the rope was not in its proper place. We have already held that the

219 Mo. App.—27.

act of the foreman was the act of the master and therefore it was unnecessary that defendant have notice of the absence of the rope. [Bodenmueller v. Box Co., 237 S. W. 879 and cases therein cited; Reynolds v. Amusement Co., 255 S. W. 140.]

Another charge of error is directed against the action of the court in refusing to give defendant's instruction No. 8, wherein it was sought to tell the jury, among other things, that "all the law required of the defendant with reference to the plaintiff was that it should exercise ordinary care to provide him a reasonably safe place in which to work. Therefore the court further instructs you that if you should find and believe from the evidence that the defendant did exercise ordinary care to provide plaintiff with a reasonably safe place in which to work, then it is your duty under the law to return your verdict in favor of the defendant." It is clear the instruction seeks to direct a verdict for defendant but it fails to cover plaintiff's case. The elements of negligence contained in the pleadings and proof must be included in an instruction directing a verdict. The instruction was properly refused. [Barry v. City, 212 S. W. 34; Sneed v. Hardware Co., 242 S. W. 696; Stewart v. Railroad Company, 224 S. W. 104, and cases therein cited.]

Finally it is charged that the verdict is excessive and the result of passion and prejudice on the part of the jury. It is not contended that appellate courts in this State have not the right to reduce the amount of damages awarded by a jury in cases of this character. The courts, however, are loath to disturb such verdict unless the amount is so grossly excessive as to shock the judicial conscience and to show the result of passion and prejudice on the part of the jury. [Mueller v. Purina Co., 254 S. W. 720; Hurst v. Railroad Co., 280 Mo. 566, 219 S. W. 566.]

Plaintiff's testimony shows serious injury to the kidneys; that he suffers pain through his left groin and

has a swelling therein if he attempts to lift any weight; his blood pressure is low and there is a bulging mass of adhesions in the left groin; other bad effects are shown which plaintiff's evidence indicates will be permanent. The jury and the court saw plaintiff and heard the testimony offered in his behalf. The verdict was returned for $5,000 and judgment was entered accordingly. Following the rule of appellate courts, we shall defer largely to the findings of the jury and the rulings of the trial court in this respect. [Anderson v. Lusk, 202 S. W. 304; Hurst v. Railroad, supra.] We are not prepared to say the judgment is excessive.

Finding no reversible error of record, the judgment is affirmed.

All concur.