# LOUIS H. OSTERTAG v. UNION PACIFIC RAILROAD COMPANY, Appellant.

### Division Two, July 25, 1914.

1. **NEGLIGENCE: Starting Engine Suddenly Without Warning: Evidence: Question for Jury.** Plaintiff, a switchman in defendant's employ, had ridden in the cab of a switch engine while it backed westward on track 5 in defendant's yards until it neared a switch connecting that track with track 4, parallel thereto on the north. There the engine stopped, hardly in the clear, while the foreman of the crew walked to a shanty south of the tracks and west of the switch, to report to the yardmaster. On track 4 stood a freight train headed west, with its engine near the switch. As this freight "whistled off," preparatory to pulling out westward, it was discovered that the switch engine was not in the clear, and accordingly the engineer moved it one or two car lengths east of the point of clearance. The freight conductor signaled his train to "come ahead" and it started. About that time plaintiff alighted from the cab of the switch engine and walked westward beside it on the south until he was five or ten feet beyond the tender, where he started to cross the track on his way to the shanty. Meantime the foreman signaled the switch engine to cross the switch ahead of the freight. The engine backed suddenly, and the tender struck the plaintiff just after he stepped upon the track. The engineer and fireman testified that the bell was rung as the engine started, but there was testimony to the contrary. *Held,* that the questions whether plaintiff in so attempting to cross the track failed to use ordinary care, and whether the switch engine was started without warning in such way and under such circumstances as to constitute negligence on defendant's part, were for the jury.

2. ———: ———: ———: **Of Company's Rule: Point not Presented in Instructions.** Where, in an action for injuries to a switchman run down by an engine behind which he attemped to pass, defendant's evidence was that switch engines in the yard were not required to answer signals with the

whistle, and testimony was admitted that defendant had a rule requiring two short blasts of the whistle in answer to any signal not otherwise provided for, error, if any, in the admission of the rule was harmless, since the instructions did not submit any fact involving that rule.

3. **ARGUMENT OF COUNSEL: Calling Claim Agent a Ghoul.** There was no error in plaintiff's counsel in his argument calling defendant's claim agent a ghoul, when speaking of his having visited the hospital and obtained a statement from plaintiff two days after the accident in which plaintiff had lost a leg.

4. ————: **Improper: Considered in Reducing Verdict.** While the improper argument of plaintiff's counsel is not reversible error in this case, it is taken into consideration in deciding whether or not the verdict is excessive.

5. **NEGLIGENCE: Excessive Verdict.** Where plaintiff, 34 years old and in good health, earning $100 a month as a switchman in defendant's employ, lost his leg by reason of the negligence of defendant's servants, a verdict of $15,000 is *held* to be excessive by $5000, especially in view of the fact that plaintiff's counsel used improper argument to the jury.

Appeal from Jackson Circuit Court.—*Hon. C. A. Lucas,* Judge.

Affirmed (*conditionally*).

*R. W. Blair* and *Watson, Watson & Alford* for appellant.

(1) Under the pleadings and evidence the plaintiff was not entitled to recover, and the court should have instructed the jury to return a verdict for defendant. Loring v. Railroad, 128 Mo. 349; Clancy v. Railroad, 93 Mo. 433; Evans v. Railroad, 178 Mo. 517; McGrath v. Railroad, 195 Mo. 94; Cahill v. Railroad, 205 Mo. 393; Brockschmidt v. Railroad, 205 Mo. 444; Degonia v. Railroad, 224 Mo. 590; Rashal v. Railroad, 155 S. W. 429; Gabal v. Railroad, 158 S. W. 16; Aerkfetz v. Humphries, 145 U. S. 418; Elliott v. Railroad, 150 U. S. 245; Railroad v. Skiles, 68 Ohio St. 458; Riccio v. Railroad, 189 Mass. 358. (2) Plain-

tiff's counsel were guilty of misconduct which should reverse this case. Haake v. Milling Co., 153 S. W. 74; Field v. Railroad, 137 Fed. 14. (3) The verdict is excessive. The injury did not deprive respondent of his ability to do other business and six per cent on $15,000 is $900 a year and it appeared in evidence he had fitted and wore a wooden leg which enabled him to get around without crutches. Hence he was not wholly but only partially disabled from performing labor and could perform many different kinds of labor with fair remuneration.

*Guthrie, Gamble & Street* for respondent.

(1) Defendant was guilty of actionable primary negligence. Tetwiler v. Railroad, 242 Mo. 187; Penney v. Stock Yards Co., 212 Mo. 309; Johnson v. Railroad, 203 Mo. 400. The signal of Moore to start the engine was negligence. Seeing the plaintiff, he should have seen that the plaintiff was in the pathway of the engine. It being negligence as to the employees of train 157 to start engine 1241, the injury to plaintiff was actionable on account thereof, although not directly anticipable therefrom. Hoepper v. Hotel Co., 142 Mo. 388; Graney v. Railroad, 140 Mo. 98; Meade v. Railroad, 68 Mo. App. 101; Smith v. Railroad, L. R. 6 C. P. 20; Dixon v. Scott, 181 Ill. 116; 21 Am. and Eng. Ency. Law (2 Ed.), p. 488. (2) The plaintiff was entitled to protection as an employee. Ellsworth v. Metheney, 104 Fed. 119; Mining Co. v. Schmidt, 104 Fed. 282; Hammil v. Railroad, 93 Ky. 343; Schumacher v. Breweries Co., 247 Mo. 153; Tetwiler v. Railroad, 242 Mo. 178; Read v. Railroad, 94 Mo. App. 377; Brick Co. v. Fisher, 79 Kan. 576; Sugar Co. v. Riley, 50 Kan. 401; Zinc Co. v. Martin, 93 Va. 491; Wallace v. Oil Co., 66 Fed. 260; Blovelt v. Sawyer, L. R. 1 K. B. D. (1904) 271; Muller v. Mfg. Co., 99 N. Y. Supp. 923; Muhlens v. Obermeyr, 82 N. Y.

Supp. 527; Adams v. Wire Co., 78 Mich. 271; Taylor v. Bush & Sons Co., 6 Pa. 306; Willmarth v. Cardoza, 176 Fed. 1; Railroad v. Oldridge, 33 Tex. Civ. App. 439; Helmke v. Thilmany, 107 Wis. 221; Walbert v. Trexler, 156 Pa. St. 112; Boyle v. Fire-Proofing Co., 182 Mass. 93; Ewald v. Railroad, 70 Wis. 420; Brydon v. Stewart, 2 Macq. (H. L. Cs.) 20; 33 Eng. L. and E. Rep. 1. (3) The question of plaintiff's contributory negligence was for the jury. Contributory negligence is for the jury where there may be an honest difference as to inference of ordinary prudence. Cooley on Torts, p. 802; Powers v. Railroad, 244 Mo. 1; Francis v. Railroad, 127 Mo. 669; Shrank v. Railroad, 159 Mo. App. 299; Bender v. Weber, 138 Mo. App. 544; Day v. Dry Goods Co., 114 Mo. App. 484. It is not necessarily negligence to rely upon signals being given before stationary cars or engines are started. Tetwiler v. Railroad, 242 Mo. 178; Penney v. Stock Yards Co., 212 Mo. 309; Black v. Railroad, 172 Mo. 177; Johnson v. Railroad, 160 Mo. App. 77; Heine v. Railroad, 144 Mo. App. 443; Dunwoody v. Railroad, 136 Mo. App. 515; Wilkins v. Railroad, 101 Mo. 105; Gurley v. Railroad, 104 Mo. 212; Railroad v. Cane, 90 S. W. (Ky.) 1061; Railroad v. Key, 150 Ala. 641; Welch v. Railroad, 176 Mass. 399; Griffin v. Railroad, 148 Mass. 148. Employees are not necessarily negligent in depending upon the observance of usual practices and signals. Although it is ordinarily contributory negligence as a matter of law to step in front of moving cars and engines without looking or listening, even under that strict and universal rule, it becomes a question for the jury when there are circumstances tending to confuse or mislead the plaintiff, or lull his senses into a sense of security. (a) As where plaintiff relies upon the observance of ordinance speeds. Rissler v. Transit Co., 113 Mo. App. 124; Hutchinson v. Railroad, 161 Mo. 246, 3 Syl.; Strauchon v. Met. St. Ry., 232 Mo. 587, 5 Syl. (b) Or an

expectation that one train will not approach the junction until another has cleared it.  Burbridge v. Cable Co., 36 Mo. App. 670, 7 Syl.  (c)  Or relies upon approaching trains making customary stops.  Percell v. Railroad, 126 Mo. App. 51.  (d)  Or relies upon customary audible signals being given at specific points.  Johnson v. Railroad, 203 Mo. 400.  (e)  Or relies upon raised crossing gates indicating safe passage.  O'Keefe v. Railroad, 108 Mo. App. 184; Palmer v. Railroad, 112 N. Y. 236; Hoelgin v. Railroad, 143 N. C. 96; Roberts v. Railroad, 177 Pa. St. 183; Messenger v. Railroad, 64 Atl. 682; Railroad v. Shulz, 183 Fed. 673; Railroad v. Larnard, 161 Fed. 520.  (f)  Or relies upon the absence of a watchman who is customarily present when trains are passing.  Montgomery v. Railroad, 181 Mo. 500; Railroad v. Amos, 54 Ark. 164; Dolph v. Railroad, 74 Conn. 538, 1 Syl.; Railroad v. Yundt, 78 Ind. 373; Railroad v. Stegenmeier, 108 Ind. 309; Richmond v. Railroad, 87 Mich. 374; Woehrle v. Railroad, 82 Minn. 169; Railroad v. Schneider, 45 Ohio St. 678; Jones v. Rolling Mill Co., 65 Wis. 315.  (g)  Or relies upon the silence of an automatic electric crossing bell.  Tobias v. Railroad, 110 Mich. 440; Kimball v. Friend, 95 Va. 138.  (4)  No improper evidence was admitted under the facts.  (5)  The verdict was not excessive.  Yost v. Railroad, 245 Mo. 252.  (6)  There was no misconduct of counsel.  The remarks of counsel were justified by the record.  State v. Allen, 144 Mo. App. 242; Partello v. Railroad, 240 Mo. 139; State v. Miles, 199 Mo. 553.  The question was one for the sound discretion of the trial court, with its better knowledge of the case as a whole. Huckshold v. Railroad, 90 Mo. 559; Gidionsen v. Union Depot Ry. Co., 129 Mo. 402; Wendler v. House Furn. Co., 165 Mo. 542; Malin v. Ins. Co., 105 Mo. App. 643.  The proper method for correction of misconduct, if any, is by proper rebuke at the time.  State v. Taylor, 134 Mo. 158.  Even if there be misconduct,

it is incumbent upon the party complaining to point out specifically his objection to the alleged misconduct, and ·ask a proper rebuke or instruction to the jury. A mere objection is not sufficient. If the objecting party fails to ask for a rebuke or an instruction, or the court fails to sufficiently rebuke or instruct the jury, the objecting party is deemed to have been satisfied and waived complaint in the absence of a final exception to the action or non-action of. the court. Dutcher v. Railroad, 241 Mo. 177; Rose v. McCook, 70 Mo. App. 189; Payne v. Railroad, 129 Mo. 404; State v. Gartrell, 171 Mo. 512; Estes v. Railroad, 111 Mo. App. 4; Peck v. Traction Co., 131 Mo. App. 142; State v. Chenault, 212 Mo. 137; Yost v. Railroad, 245 Mo. 151.

ROY, C.—This is a suit for damages for personal injuries. The plaintiff recovered a verdict and judgment for $15,000.

He was thirty-four years old at the time of the injury, and in good health. He had been in the employ of defendant as a switchman about four years, and had been in railroad work longer. The injury occurred in defendant's freight yards in Kansas City, June 7, 1910, about 6:40 p. m. Plaintiff was one of the crew of engine No. 1241.

The petition alleges the negligence as follows:

"That while such switch engine was stationary and plaintiff was engaged in the act of passing around the end of the same, and in a position of peril from the movement of said engine backward, the said switch engine, in consequence of and through the negligence and mismanagement of the agents, engineers and other employees of the defendant, including the foreman of said switching crew, was suddenly, swiftly and violently moved backward, toward and against the plaintiff; and said agents, engineers and other employees, including the foreman of said switching crew, negli-.

gently failed to give any warning to the plaintiff, as due care required them to do, of such movement of such engine.''

It alleges the loss of his left leg about half way between the knee and hip, and that he was earning one hundred dollars a month, and prays for $25,000 damages.

The answer contained a general denial, a plea of contributory negligence and an allegation that under the law of Kansas the plaintiff assumed the risk. The reply is a general denial.

Tracks four and five in the defendant's yards running parallel from east to west are connected at the west by a switch, from which the track continues west. On the south side of the track and two or three hundred feet west of that switch was the "shanty" or office where the defendant's employees went to get and give orders and reports. Freight train No. 157, containing about fifty cars, was on track four. The road engine was coupled to the west end of that train and headed west. In front of the road engine was coupled the helper engine reversed, i. e., with its head to the east. It was there for the purpose of helping the train start westward on an upgrade. South of that train was engine 1241 on track five. It was coupled to its tank or tender, but not to any cars. The plaintiff was in the cab of his engine at the time it arrived near the switch. The foreman of that engine, Mr. Moore, had come with the engine from the east, riding on the footboard on the rear end of the tank, which was in advance as the engine backed west. On reaching that spot, the foreman left the engine and went to the shanty to report to the yardmaster, Shull, and to receive additional orders if there were any. It was quitting time for that engine and crew, and, in the absence of further orders, the engine was to be taken westward beyond the shanty to the roundhouse, and the crew were to disperse to their homes. As

Moore reached the shanty, he met and passed Detwiler, conductor of the freight who was going towards his train. About that time No. 157 "whistled off," i. e., signaled that it was ready to go. Engine 1241 was too near the switch to permit the freight to pass safely. It headed east so that the freight could pass, and stopped with the west end of its tank one or two car lengths east of the clearing point of tracks four and five. The west end of the helper engine in front of the freight train was about the same distance east of the clearing point. Detwiler, the freight conductor, signaled his train to "come ahead" and it started. About that time the plaintiff, having left the cab of his engine about the time it last stopped, passed west between tracks four and five on his way to the shanty, and Moore, the foreman of 1241, with the permission of Shull, the night yardmaster, signaled his engine to "back up," which meant to come on west over the switch ahead of 157. The engine started quickly and the rear end of the tank, which was for the time in front, struck plaintiff within five or ten feet after starting. The plaintiff had stepped on track five on his way to the shanty.

Melvin H. Milam, fireman on the "helper" engine, witness for plaintiff, testified as follows:

"Q. Suppose you tell us in your own way what happened there that night with reference to the switches and the engines on 157 and this engine 1241. A. Well, 157 was made up on track 4. 1241 had made a Frisco transfer and backed out the stock track and onto 5 and come up about even with the switch engine on the head end of 57. They stood there quite a little bit—I don't know how long—and the conductor —we got the switch anyway and the conductor gave us a highball. When they pulled up there they pulled up too far and they had to back down again to get in the clear.

"Q. That is 1241? A. 1241. Then they gave us the switch and the conductor gave us a highball and we whistled off and started up. Just as we started somebody gave a sign for 1241 to back up towards the west and beat us to the switch. Then is when Ostertag got hit.

"Q. How far did you say that 1241 moved when it headed east to clear 4? A. The length of the engine.

"Q. You say you got the switch. Did your train whistle for the switch to get it? A. No. They gave us the switch and we whistled off.

"Q. Where was 1241 at the time you started? A. They were about even with the switch engine of 57.

"Q. That is, with your engine? A. Yes, sir.

"Q. How long was it after you started before 1241 started west? A. Well, I could not say.

"Q. As your engine stood there alongside of 1241, how far was your tank, the end of your tank, from the clearing point between tracks four and five? A. Well, if I remember right about the length of the engine. Probably a few feet further.

"Q. How far would you say you moved with the helper engine from the time you started to the west until you stopped? A. Ten or twelve feet, something like that, maybe not that far. All I remember is we got started, whistled off and got started,"

Plaintiff took the deposition of W. H. Wildermood, engineer of engine 1241, and the defendant read it in evidence. He testified:

"Q. Mr. Wildermood, suppose you tell us in your own way what occurred there in the operation of that engine from the time you first backed west toward the switch shanty the evening Ostertag was hurt. A. Well, we backed up on what we call No. 5 and engine 1151, night engine, was switching on the hill, and we couldn't get out so I stopped where I supposed it

261Mo30

would clear 4. Well, night engine 1151 shoved in the clear.

"Q. That was onto track 3? -A. That was on track 4. We were on track 5. No. 157 that is a train of local merchandise, going west, whistled off. Fireman says to me, he says, 'Go ahead a little in the clear.' I says, 'I am in the clear,' and he says, 'Well, you don't clear good,' and Lou Ostertag dropped off the engine and says, 'Yes, give them a good clear.' So I let engine 1241 slack ahead in the clear about thirty or forty feet. I will say that much, but I don't know whether that far, and maybe a little farther. After I stopped the fireman says, 'Back up.' I says 'What?' The fireman says, 'Moore says back up,' and I looked over the tank and seen Moore, the foreman, give the signal to back up, and George Tighe lining the switch up for four. I started back, and I went back probably two engine lengths, maybe a little more, and the fireman hollered, and he says, 'Stop, we have run over Lou Ostertag,' and I stopped as quick as I could.

"Q. Where was the west end of this train 157, the tank of the helper engine on that train, with reference to the clearing point when you stopped before you headed east to clear? A. Well, I don't know. I didn't pay no attention.

"Q. How quick after you had headed down in the clear was it that the fireman told you to back up? A. Well, I don't know as I any more than stopped till the fireman says, 'Back up,' not much more anyway.

"Q. What made you say 'what?' in that surprised sort of way to the fireman? A. Well, because the fireman told me to slack ahead in the clear. 57 whistled off and I supposed they was going to let 57 go before us. Didn't think of the way it was done.

"Q. Was that the way it had ordinarily been done? A. Yes, sir.

"Q. How fast did you get going before you had run over Ostertag? A. Well, I don't know. I could not say.

"Q. Give your best judgment? A. That would be a hard matter to do.

"Q. Can't you give us some idea? A. No, sir. Don't believe I could.

"Q. Did you know that—I believe you said you did know that 157 had started. A. Yes, sir. They whistled off and was supposed to start. I heard them working steam.

"Q. After you said 'What?' and the fireman said that Moore was signaling to back up and you looked and saw Moore signaling to back up and Tighe throwing the switch, did you understnd that you were to cross that switch before 157 could get to it? A. I understood that's what they meant for me to do.

"Q. Did that require you to act promptly and quickly? A. Well, yes, it did, to a certain extent.

"Q. How wide open did you open the throttle? A. Well, I could not say about that.

"Q. Did you try to make a quick run for that switch? A. Ordinarily. If it hadn't looked safe I wouldn't have started.

"Q. How long after Ostertag got off the engine before you started back? A. Well, it didn't seem to me more than a minute. It might have been a little longer and it might have been not any more.

"Q. How far did you run altogether on that last movement? A. Well, in my judgment I didn't run over three engine lengths from the time I started till I stopped.

"Q. What is about the length of the engine? A. Of that engine? I suppose it was about probably maybe between forty and fifty feet, the engine and

tank. When we speak about the engine we mean the tank and all.

"Q. That's what I mean. Where was Ostertag after you stopped? A. Ostertag was at the front end of the engine."

He testified that the fireman pulled the bell when he started to back up.

E. C. Allison, fireman of 1241, testified that he did not ring the bell before they started but just as they started.

All witnesses except the above two and the plaintiff testified that they could not say whether the bell was rung.

Plaintiff testified: "Well, we had been down to the freight house and set a freezer on 5½, and we came back up No. 5, backing up, understand, working that engine 1241, when they were getting up towards the head end of this 57, she made up on 4 alongside of us, and while we was heading up towards the head end of this train, she had whistled off, we had run up on the frog and stopped, I was up in the cab all this time, got in the cab when we were leaving the freight house platform, cut the car off and put a block under it so it would not run off, climbed up in the cab and rode up standing up there with the engineer and fireman. Well, this train had whistled off when we ran up on this frog, and somebody told us to get in the clear, I couldn't say who it was, but I heard somebody say, 'Get in the clear;' the engine ran in the clear, ran down probably opposite the road engine, at that time she was starting to move, you know, so just as he stopped in the clear I got down on the left side of the gangway, got out of the cab, you know, the back of the cab, got down on the left side, I walked back between this moving train, and our engine was standing still here, on the left side of me, this train was pulling out along on the north side, on my right, and I was heading west; just after I was walking along

here, the side of our tank, I was watching this train, too, you know, she was under motion, this engine of ours was standing still, I got to the back of the tank of our engine, I stepped across with this foot over the north rail, cut diagonally across, going up to the shanty, customary to go up there, you know, when the engine is idle, and the foreman was up there— yes, he was up there, so just as I stepped behind the tank this way, about to cross this way, the engine hit me in the back, knocked me down, and that is all I know.

"Q. Was engine 1241 stationary at the time you passed behind it, when you first stepped in behind it on the track? A. Yes, sir; that engine was standing still, after I stepped over the rails to cross it, she was still standing, but she moved immediately after I started across.

"Q. How far would you judge you had got away from the engine, from where the engine was, when it stopped still, and you turned around the corner of the tank when it hit you. A. How far was I from the back of the tank?

"Q. Yes, sir; how far do you say it had moved? A. Well, maybe it might have been from here to that gentleman, the second man here, I don't know, I just stepped over and across, out, you know.

"Q. Well, give your best judgment of it in feet? A. Well, I should say five—not more than ten feet, anyhow.

"Q. You may state whether or not any whistle was blown or bell rung? A. No, sir; God knows!

"Q. What injuries did you receive there at the time, Mr. Ostertag? A. Well, I lost this limb five inches and a half from the hip joint; bruised this eye here, this left eye; this right hip was bruised clear down to the ankle and back, it is skinned; the watch here ran into my side; there is the dent in it yet. I

carried that watch right here, it ran this watch-stem into my side, and part of the chain I had on it.''

"Q. You feel that foot, you mean the foot that is gone? A. Yes, sir, feel the natural leg, the toes down here, it hurts sometimes, feels like a great wheel standing on the toes, or something.

"Q. Now, how does the limb bother you now, in what way? A. Well, from walking around, you know, it gets sore and I can't stoop over, you see, I can't bend, I have to stand stiff like, if I want to stoop over, you know, it sets right up in the crutch, you know, it is hard on me in the summer time, especially hot weather.

"Q. What difference does the summer time make? A. The heat, you know, and perspiration, sweat a good deal, kind of chafes it, and it takes a long time, you know, to get a stump healed up, to get it good and solid and get used to it.

"Q. Then you may answer directly the question whether or not that limb has ever been free from pain since this accident? A. No, sir.''

He testified that the engines were operated on signals, that he was familiar with the rules of the company and with the signals, that the employees were supposed to look out for the signals, that the switch engines have no schedule time, and that there is danger from their moving back and forth. He also testified that he did not see the signal given to 1241 to back up, that he was not looking for it, but was looking where he was going.

C. A. Moore, a witness for defendant, testified as follows:

"Q. Now, what conversation, if any, did you have with Mr. Shull up there in regard to the movements of your train and movements of 157? A. Why, I asked him if we had time to go out ahead of 157, or something to that effect, or I remarked to him that

we had time to go ahead of them, and he said yes, we had.

"Q. Had you seen at that time Mr. Detwiler— where was he at that time, do you remember, did you see him? A. He came out of the office as Mr. Shull and I were talking, with his bills in his hand, and when I got through telling Mr. Shull about this, about the time I made the remark I says, 'Is 157 ready to go?' He says, 'Yes, just about.' 'Well,' I says, 'we can get out ahead of them.' He says, 'Yes, come ahead;' so I just turned and gave my man a sign to back up.

"Q. Now just state to the jury whether you could tell from where you were at that time, you could tell, now, where Mr. Ostertag was at that time, if you know? A. No, I could not tell just exactly where he was at; he was near the tender of the engine.

"Q. And was the engine standing still at that time? A. When I gave my back-up signal?

"Q. Yes. A. Yes, sir."

Two days after the injury, Mr. Taylor, representing the defendant, called to see plaintiff at the hospital and plaintiff signed a statement at Mr. Taylor's request, stating among other things that plaintiff could not say whether the bell was ringing when he was struck, as there was so much noise. Plaintiff was at that time under the influence more or less of an opiate. That statement was read in evidence by the defendant. The plaintiff read in evidence over the objection of defendant a rule of defendant providing for two short whistles in answer to any signal not otherwise provided for. During plaintiff's examination in chief the following occurred:

"Q. You may state whether there was any custom in that yard at that time and previous to that time, I mean the time of your injury, as to any signal other than the bell from the engineer when he gets a signal to start to work again after being laid off or

tied up for any time, is there or is there not or was there or was there not such a custom? A. Yes, sir.

"Defendant's counsel objected as incompetent, irrelevant and immaterial, because not pleaded, and asking for the conclusion of the witness, and asking him to pass upon what is the custom, assuming facts not proven. The court overruled the objection. To which ruling of the court defendant then and there duly excepted.

"Q. What was the custom, Mr. Ostertag?

"Defendant's counsel objected to the question for the reason that the witness is not shown competent, not shown there was any custom, and not within the issues of the pleadings. The court overruled the objection. To which ruling of the court defendant then and there duly excepted.

"Q. What was the custom? A. Well, if the engine was standing there, and we all had been up to the shanty, say, for instance, we come down with that engine, and the foreman or I, or anybody would give them a signal, he did acknowledge the signal by giving two short blasts of the whistle—choo, choo, answer he got your signal, lots of times.

"Q. Was it customary all the time?

"Defendant moved to strike out the preceding answer for the same reasons last above stated, it being a mere conclusion of the witness. The court overruled the motion to strike out. To which ruling of the court defendant then and there duly excepted.

"A. And other days when they all go to work he will acknowledge the foreman's signal and mine, if I give any, two short blasts of the whistle.

"Defendant's counsel moved to strike all that out for the reasons last above stated. The court overruled the motion. To which ruling of the court defendant then and there duly excepted."

The plaintiff pleaded and proved a statute of Kansas providing that a servant may recover against

the master for the negligence of a fellow servant upon the giving of a notice not necessary here to be stated.

Defendant read in evidence a statute of Kansas adopting the common law as modified by the constitution, statutes, decisions of the courts, etc., also the case of Dyerson v. Railroad, as reported in 74 Kansas Reports, page 528. Defendant read in evidence a rule of the company providing that "all employees are further warned that they must not rely on others to notify them of the approach of a train." The defendant's witness Moore testified that it was not customary for switch engines to answer signals with the whistle.

Among the instructions the court gave the jury the following for the plaintiff:

"A. If from the evidence you find that on or about the 7th day of June, 1910, while plaintiff was in defendant's employ as a member of a switching crew in charge of and operating a switch engine of the defendant in the course of its business, he was, without negligence upon his part, struck and injured by said switch engine, and that he was so struck by reason of the negligence, if any, of any of defendant's servants in charge of such engine or in control of its movements in causing such engine to move backward agaist the plaintiff suddenly and without warning, your verdict should be for the plaintiff. By 'negligence' as used above is meant the want of such care as persons of ordinary prudence should be expected to use under the same or similar circumstances."

And the following for the defendant:

"1. The court instructs the jury that it was not negligence of itself for defendant to move engine 1241 over track 5, passing the switch connecting track 4 and track 5, ahead of train 157, at the time and place described in evidence and you cannot find for plaintiff on that issue.

"2. The court instructs the jury that it was not negligence of itself for foreman Moore to give a signal to engine 1241 to come ahead of train 157 at the time and place mentioned in evidence and you cannot find for plaintiff on that issue.

"3. The court instructs the jury that there is no evidence in this case showing that the agents and servants of defendant saw plaintiff in a situation of peril after he stepped onto the track in front of switch engine 1241, in time to have stopped said engine after it was started and avoided injuring the plaintiff and you will therefore find for defendant on that issue."

And refused to give other instructions asked by defendant, among which are the following:

"4. The court instructs you that under the law of Kansas, read in evidence, it was not negligence for defendant's employees to move said engine over track 5, ahead of train 157 on track 4 as detailed by the evidence, and you cannot find defendant guilty of negligence in so running engine 1241 at the time and place described in evidence.

"5. The court instructs you that the rule of defendant read in evidence that 'all employees are further warned that they must not rely on others to notify them of the approach of a train,' did not require the engineer of 1241 to give plaintiff any warning just before starting said engine, in the absence of knowledge of said engineer that plaintiff was in the act of going upon said track at said time."

Plaintiff's counsel in his opening statement to the jury said that plaintiff was with Dewey at Manila Bay, to which counsel for defendant objected, when the following occurred:

"Mr. Guthrie: I mean he was a sailor in the United States Navy.

"Mr. Watson: I object to that as incompetent, irrelevant and immaterial.

Ostertag v. Railroad.

"The Court: It don't make any difference what his employment has been at other times. It might be a matter of argument when you come to argue the case.

"Mr. Guthrie: I will explain, Your Honor, because I want to keep within the line; the theory upon which I am making these suggestions as to his early experience is, that his past experience has not been such as to qualify him for any form of earning capacity outside of the railroad business and the duties of a sailor.

"Mr. Watson: I object to that because no such allegation is in the petition, no such issue framed here; it is not competent for any purpose under the allegations of the petition here.

"Mr. Guthrie: It may be a question of good faith on the part of counsel. (Reading from petition) 'Was impaired in his earning capacity to the entire extent thereof, and his enjoyment of life and the exercise of his physical faculties was permanently impaired.'

"The Court: That he was with Dewey at Manila that would not—

"Mr. Guthrie: I apologize to the jury on that particular form of expression.

"Mr. Watson: We move that the jury be instructed to disregard that statement.

"Mr. Guthrie: Gentlemen, I apologize to you—that his services in the navy included that particular item of service.

"Mr. Watson: I object to it and move that the jury be discharged.

"The Court: The jury are instructed to disregard those statements which are outside of the evidence."

During the argument of Mr. Guthrie for plaintiff to the jury the following occurred:

"I want to confess to you frankly in this case, that this is a hard case for me to try. Years ago in

the little town from which we came, Louis Ostertag and myself went in the same swimming hole—he is my boyhood friend—and as I think of him there, mangled, torn, bruised, his clothing and his flesh strewn along that rail, his foot hanging to his limb by this battered mass of flesh—as I think, two days after that, of this claim agent for this railroad company—that man just coming out of an operation, in the condition that you understand was inevitable in this case—that ghoul following around that hospital endeavoring to get that man's name to a statement which should damn him in the future—when I think of these practices, gentlemen, it is hard—

"Mr. Watson: I object to any such language as that as incompetent and improper.

"Judge Douglass: We except to that language and ask that the jury be instructed to disregard it, and the jury be discharged.

"The Court: I did not hear the statement.

"Mr. Guthrie: I did not even finish the statement."

Mr. Guthrie then proceeded to comment on the fact that the court had modified some of defendant's instructions before giving them. Defendant objected, and the court sustained the objection. Mr. Guthrie then proceeded as follows:

"Gentlemen, I say these counsel who are so easily hurt and shocked in their feelings are here like the woman of bad repute who hates to have any suggestion made about virtue in her presence, because it hurts, and because they were trying to argue this case to you—

"Judge Douglass: I object to the remark of counsel for the simple reason that he is imputing improper motives to counsel in the case, and there is no testimony before the court or jury to that effect; we except to it and we ask now that the jury be discharged from further consideration of this case.

"Mr. Guthrie: I do impute improper motives—

"The Court: You better stay within the record and not wander around these matters outside.

"Mr. Guthrie: If your Honor please—

"The Court: The attorneys conducted themselves along legitimate lines in the trial of this case.

"Mr. Guthrie: Have I no right to argue that counsel are seeking to mislead the jury?

"The Court: That is not the effect of the way you are arguing.

.  .  .  .  .  .

"Mr. Guthrie: I say to you that in my honest judgment, and I hope it will meet your conviction, gentlemen, the amount claimed here will not compensate him, for what this has meant to him. Put yourself in his place. Consider what it would mean to you, and others similarly situated, and answer that question according to the dictates of your honest judgment.

"Mr. Watson: We object to that.

"Judge Douglass: The courts have said a number of times it is a very improper appeal to the jury to put themselves in the place of plaintiff. We object to it, and now move that the jury be discharged.

"The Court: Yes, sir.

"Mr. Guthrie: I said 'similarly situated.'

"The Court: It is objectionable; I would avoid that."

I. Appellant has chosen to present this case on the theory that the plaintiff stepped on the track in front of a moving engine without looking or listening for its approach. It put in evidence the case of Dyerson v. Railroad, 74 Kan. 528, in support of that theory. It is enough to say that this case does not involve that proposition. It belongs to that class of cases which involves the

*Negligence: Starting Engine Suddenly: Evidence: Question for Jury.*

question as to whether an engine in the switch yards was suddenly, without warning, put in motion under such circumstances as to cause an injury to one entitled to such warning. The fact that the engine may have started to move just before plaintiff stepped into the place of danger, under the circumstances of this case, does not transfer this case from the latter class to the former.

Here, the plaintiff walked along by the side of an engine standing still on the track. He was close enough to touch it with his left hand. At his right was the engine of the freight which had "whistled off," had been given the switch, and, according to the evidence for the plaintiff, was starting on its way, the engines on both tracks, according to some of the witnesses, being only a car's length from the clearing point. What is more, engine 1241 had just cleared the track for the freight, and plaintiff, as he left the engine, had said: "Yes, give them a good clear." The circumstances so nearly precluded the thought of starting 1241 over the switch in front of the freight, that the engineer of 1241, on being told of the signal to "back up" said, "What?" The evidence is that the engineer made a quick start. The situation demanded that he should start quickly, or not at all. The evidence was such as to make it clearly a question for the jury as to whether the plaintiff was guilty of the want of ordinary care in attempting to cross track 5 as he did, and whether the engine was started without warning in such a way and under such circumstances as to constitute negligence on the part of the defendant. This case falls clearly within the Tetwiler case, 242 Mo. 178, as to the above questions.

II. This suit is not brought under the humanitarian doctrine, and does not involve it in any way. We shall not discuss the cases cited on that question.

III.  Appellant says that it was error to admit in evidence defendant's rule requiring two short whistles in answer to any signal not otherwise provided for.  The evidence for defendant was that switch engines in the yards were not required to answer signals with the whistle.  The instructions did not submit to the jury any fact involving that rule.  If the admission of such rule in evidence was error it was harmless.

*Evidence of Company's Rules: Not in Instructions.*

IV.  Plaintiff's counsel was not guilty of misconduct in saying what he did as to the statement signed by the plaintiff at the request of defendant's claim agent and read in evidence by the defendant.  That statement read in evidence was supposed to be harmful to the plaintiff's case.  The circumstances under which it was procured were such that we shall not say that counsel exceeded the bounds of propriety in discussing that subject.

*Argument of Counsel.*

As to the other objections made to the conduct of plaintiff's counsel, it is sufficient to say that the defendant did not at the time ask that the counsel for plaintiff be reproved by the court.  The court sustained the objections, and in one case instructed the jury not to consider counsel's statement.  In two instances defendant, by reason of such misconduct, asked that the jury be discharged.  There is nowhere, so far as we know, any authority for discharging the jury for such cause, though we do not now decide that in no case would such action be proper.

V.  Though we have held that the misconduct of plaintiff's counsel in his argument to the jury is not reversible error under the circumstances of this case, yet we take such conduct into consideration in deciding the question of excessive damages, in accordance with the rule in Applegate v.

*Excessive Verdict.*

Railroad, 252 Mo. l. c. 202, and Kinney v. Railroad, *ante,* p. 97.

If the plaintiff will, within ten days, enter a remittitur of $5000 as of the date of the judgment in the trial court, the judgment will be affirmed for $10,000, with interest at six per cent from the date of the judgment in the trial court; otherwise the judgment will be reversed and the cause remanded. *Williams, C.,* concurs.

PUR CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.