GOODWIN v. MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant.—72 S. W. (2d) 988.

Division One, June 12, 1934.

*Thomas J. Cole* and *David E. Blair* for appellant.

*Clay C. Rogers, Pross T. Cross* and *Mosman, Rogers & Buzard* for respondent; *A. B. Lovan* of counsel.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff had a verdict for $30,780. A *remittitur* of $15,000 was ordered and made, and a new judgment entered for $15,780. Defendant has appealed from that judgment.

Plaintiff claimed to have been injured by getting coal in his eyes, resulting in the loss of his left eye and the impairment of his right eye, while working for defendant as a section hand at Marshall in the fall (October or November) of 1924. The only evidence in the record as to how his injury occurred was plaintiff's own testimony. He said that frequently when freight trains came into Marshall there would be no coal in the front part of the tender so that the fireman could conveniently reach it when firing on the road. On such occasions, a section man would be ordered to shovel coal from the back

part of the tender. They called this coaling the engine. The engine-men "generally went to supper" while the section men "coaled the engine." Sometimes several section men would work on the same tender and when only one man worked it would often take him more than an hour to coal the engine. Plaintiff said that on the day he was injured he had quit his regular work at four P. M. and was waiting at the depot to see the afternoon passenger train arrive. The freight agent came to him and told him that the fireman on an engine needed some coal. Plaintiff told him that he could not go on the engine without orders from his boss. (The section men got overtime pay for this work after regular hours.) The freight agent got the section boss to come down between five and six o'clock and he told plaintiff to go up and shove down some coal for the fireman of the freight train "so they could go to Boonville." The engine was switching at that time and plaintiff said "I told him the trains were moving, I didn't want to get up there and shovel coal because it was dangerous, he said they would stop for me, to go to supper, as they generally did." The foreman then went home.

Plaintiff testified as to what happened thereafter, as follows:

"I caught the tender, they stopped for me to get on at the crossing and I got up on the tender, then they pulled up on the track, oh, quite a ways above and did some switching where they could cut off those cars and switch them onto each track they wanted to get and when they stopped over there I believed they would stand there a while and they did not, . . . started to throwing this coal down. . . . I was standing up on the coal behind next to the back of the tender. . . . It was sloping, a high point and sloped this way down towards that hole, I was standing about on top of this coal shoveling it this way towards that hole. . . . I had been working there not over five or six minutes until all at once suddenly they let loose there on that hillside and gave it a jerk, jarred back and throwed me forward, down with a shovelful of coal in my hand, somehow or another; when I went down with that in my hand, the middle of the shovel handle hit some kind of a lump or something in there and throwed this here coal on the side of my face. . . . I heard no warning at all, heard no whistle or no bell. . . . They generally hollered at me, or told you to brace yourself or whistle, or rang the bell long before they moved. . . . It got into both eyes, got into the left eye worse than the right one. . . . Well, I told the fireman that I would have to get off, stop the train, I got my eye full of coal, I couldn't do any more."

On cross-examination plaintiff testified further, as follows:

"Q. When you climbed into the tender and started shoving the coal down, was the fireman and engineer on there? A. Yes, sir. . . . Q. They were just standing there? A. Standing or sitting.

Q. How far from them were you? A. He was standing there where he fires. . . . Q. He knew you were up there? A. He seen me get up there. . . . Q. Did they tell you to get up there themselves? A.. Yes, sir; he said he would have to have some coal. . . . Q. Have you ever been on an engine coaling it when it was moving? A. No, I would not do that; no, sir. Q. Never have? A. No, sir; they do not coal them when they are moving, unless they were moving awful slow. Q. Didn't coal them when they were moving unless they were moving awful slow? A. Couldn't stand up. Q. Now, Moad (the foreman) told you not to coal that engine, didn't he, until the fireman and engineer went to supper? A. Didn't tell me not to, he said coal it while they went to supper, he told me to coal it while they were going to supper. Q. You did not wait? A. They were not going. Q. You didn't wait until they went to supper, you got up and started to coal? A. They told me they was not going to supper, they had been, or something. Q. Moad's directions were to you to coal it while they went to supper? A. Yes, sir. . . . Q. He told you to only do it while they did go to supper, didn't he? A. Yes, sir. Q. And despite that, you got on and coaled it, anyhow? A. They told me they was not going to supper, I had to coal it some time. Q. Were they making steam there? A. Sure, they was making steam. Q. The engineer and fireman were there making steam all the time? A. Yes, sir. Q. Getting ready to start? A. Yes, sir. Q. You knew that? A. They was switching back and forth, they pulled up there where I told you they stopped. Q. You knew they were going ahead to continue to switch? A. I didn't know it. . . . Q. In other words, every time they moved they would give you some kind of warning? A. I had coaled before and every time they moved they would give me a warning. Q. You have coaled before when the engines would move around? A. Yes, sir; but they would stop? Q. What did you do then, you would coal? A. Brace myself until they stopped. Q. Brace yourself? A. Brace myself until they stopped. Q. Would you brace yourself and go ahead and coal? A. No, sir. Q. Brace yourself and rest? A. Yes, until they stopped.''

Plaintiff said that the coal was mostly fine slack coal; that the pile was four or five feet high; and that the way the shovel struck, when he fell, caused a lot of it to go in his left eye and a smaller amount in his right eye. Plaintiff said that he went to the place where he boarded and that the lady there undertook to get the coal out with a handkerchief and also bathed his eyes. (She corroborated this part of his testimony.) He said that his eyes hurt the next day; that he told his foreman about getting coal in them; that his eyes bothered him continuously; that the pain ''would come and go, get worse at times and get better and then get worse again;'' but that

he kept on working thinking they would get better until finally, in April, 1925, he was taken to defendant's hospital in St. Louis for treatment, where an operation was finally performed. Plaintiff testified and had evidence of other witnesses to show that, prior to the time he claimed to have been thrown down in the tender, his eyes were in good condition; that he read without glasses; and that he did work on the track such as lining up rails which took exceptionally good eyes. Plaintiff admitted that in 1918 a piece of ice flew up and went into his left eye while he was cleaning ice from the track with a pick. He said, however, that this injury cleared up in a few days and never caused any further trouble. Plaintiff also had medical testimony as to the connection between the subsequent condition of his eyes, requiring the operation, and infection which might result from getting coal in them, in the manner he described.

Defendant denied that the incident, which plaintiff related, ever happened and produced a number of engineers and firemen of freight trains coming into Marshall at the time who testified that they never heard of it. Plaintiff's foreman, and other men who worked with plaintiff, said that plaintiff never told them about it or said that he got coal in his eyes. Defendant also had several witnesses who told of other injuries to plaintiff's eyes; said that he wore glasses before the fall of 1924; that he had a speck or spot in his left eye; and that both of his eyes looked weak, red, and watery. Defendant also had statements signed by plaintiff in 1925 while in defendant's hospital in St. Louis which told of the incident in 1918 when a piece of ice went into his eye; stated that he never had any other accident to his eyes; and said there was no negligence on the part of defendant that caused his eye trouble. Defendant also had medical testimony tending to show that plaintiff had a cataract in his left eye, of such long standing that it was partly absorbed, due to some old injury which had been severe enough to puncture the eyeball; that he had a senile cataract forming in his right eye due to age and deterioration or disease; and that the condition of the right eye was not due to any injury to the left eye. Plaintiff denied that he ever injured his eyes except the two times while working for defendant, in 1918 and 1924. He said that two statements were taken each time at defendant's hospital, one covering the 1918 injury and one covering the 1924 injury; also said that he was unable to read at the time he signed them; and that he did not make some of the statements they contained. Defendant's witnesses in turn denied that two statements were taken or that plaintiff ever claimed that any accident occurred in 1924.

The negligence alleged and submitted was that plaintiff was, by his foreman, "directed and ordered to go and work upon a locomotive engine and shovel and move coal in the tender of said engine,"

and that while he was doing so "the defendant, Railroad Company, or its engineer or servant in charge thereof, negligently and carelessly, caused, allowed or permitted said locomotive engine to move suddenly and violently, without giving plaintiff, Goodwin, any warning or notice thereof." Defendant makes no objection to plaintiff's instructions but assigns as error the overruling of its demurrer to the evidence. Defendant frankly says that it "does not now contend that there was no evidence justifying the submission to the jury of the questions of plaintiff's injuries to his eyes from coal dust received, as he testified, in a fall in defendant's locomotive tender, and that plaintiff's condition at the time of the trial resulted therefrom, if plaintiff otherwise made a case for the jury." Defendant's contentions on the demurrer are that plaintiff failed to make a case for the jury for the following reasons: First, that defendant owed no duty to plaintiff to warn him that the engine was to be moved because employees whose duties take them along and upon the tracks and between, around and upon moving engines and cars must look out for their own safety; second, that the risk of the engine being moved while plaintiff was shoveling the coal in the tender was a risk which was necessarily incident to that work and that plaintiff, as a matter of law, assumed the risk of injury therefrom; and third, that plaintiff was guilty of contributory negligence, as a matter of law, in doing the work without knowing that the engine would remain stationary until he had completed it.

These contentions really present only one question which is decisive of the demurrer to the evidence, namely: Did defendant owe plaintiff a duty to warn him before the engine was moved or was it plaintiff's duty to look out for himself? This is true, because if plaintiff was not under the duty of looking out for himself he did not assume the risk of the engine being moved without warning while he was working. If the enginemen owed him the duty of warning him before moving the engine their failure to warn him would be negligence and under the Missouri rule a servant never assumes risks arising from negligence for which the master is liable, but "those alone which remain after the master has exercised ordinary care." [Whittington v. Westport Hotel Operating Co., 326 Mo. 1117, 33 S. W. (2d) 963; Clift v. St. Louis-San Francisco Railroad Co., 320 Mo. 791, 9 S. W. (2d) 972; Hoffman v. Peerless White Lime Co., 317 Mo. 86, 296 S. W. 764; Compton v. Rich Construction Co., 315 Mo. 1068, 287 S. W. 474; Holloway v. Missouri, K. & T. Railroad Co., 276 Mo. 490, 208 S. W. 27; Johnson v. Waverly Brick & Coal Co., 276 Mo. 42, 205 S. W. 615; Williams v. Pryor, 272 Mo. 613, 200 S. W. 53; Fish v. C., R. I. & P. Railroad Co., 263 Mo. 106, 172 S. W. 340, Ann. Cas. 1916B, 147; Patrum v. St. Louis-San Francisco Railroad Co., 259 Mo. 109, 168 S. W. 622; Honea v. St. L., I. M. & S.

Railroad Co., 245 Mo. 621, 151 S. W. 119; George v. St. Louis-San Francisco Railroad Co., 225 Mo. 364, 125 S. W. 196; Charlton v. St. Louis-San Francisco Railroad Co., 200 Mo. 413, 98 S. W. 529 (earlier cases cited).] If, on the other hand, it was plaintiff's duty to look out for himself, the risk of the engine being moved without warning "would be a risk incident to the work undertaken, in which the employer would have no part, and which the employee assumed as an implied part of his contract of employment, and for such an injury he could not recover damages from his employer for the reason he assumed the risk." [Johnson v. Brick & Coal Co., 276 Mo. 1. c. 53.] For example, a fireman expects to shovel coal on a moving engine and must learn to protect himself, while doing his work, from its usual ordinary starting and stopping and increases or decreases in speed. Those are risks necessarily incident to his employment, the very nature and purpose of which contemplates that much of his work shall be done while the engine is in motion. Likewise, the same question is decisive of the matter of plaintiff's contributory negligence. If it was the duty of the defendant to warn plaintiff before moving the engine, he could not be guilty of contributory negligence as a matter of law in starting to do the work when he did not know that it would not be moved before he completed it.

Defendant seeks to apply the rule, applicable to section men, and others working on railroad tracks, that such employees must look out for his own protection from trains thereon. [Evans v. Wabash Railroad Co., 178 Mo. 508, 77 S. W. 515; Cahill v. C. & A. Railroad Co., 205 Mo. 393, 103 S. W. 532; Degonia v. Railroad Co., 224 Mo. 564, 123 S. W. 807; Kirkland v. Bixby, 282 Mo. 462, 222 S. W. 462; Hammontree v. Payne, 296 Mo. 487, 246 S. W. 915; Hughes v. M. R. & B. T. Railroad Co., 309 Mo. 560, 274 S. W. 703; Voorhees v. C., R. I. & P. Railroad Co., 325 Mo. 835, 30 S. W. (2d) 22.] Switchmen and other employees working in and about railroad yards or cars or engines moving or about to be moved therein are likewise under the duty of looking out for themselves, in the absences of a rule, custom or assurance requiring a warning, when going around, on or near tracks, engines or cars. [Rashall v. St. L., I. M. & S. Railroad Co., 249 Mo. 509, 155 S. W. 426; O'Donnell v. B. & O. Railroad Co., 324 Mo. 1097, 26 S. W. (2d) 929; Jones v. St. Louis-San Francisco Railroad Co., 325 Mo. 1153, 30 S. W. (2d) 481; Martin v. Wabash Railroad Co., 325 Mo. 1107, 30 S. W. (2d) 735; Ingram v. Mobile & Ohio Railroad Co., 326 Mo. 163, 30 S. W. (2d) 989; Armstrong v. Mobile & Ohio Railroad Co., 331 Mo. 1224, 55 S. W. (2d) 460; Reed v. Terminal Railroad Assn., 62 S. W. (2d) 747; Crossno v. Terminal Railroad Assn., 333 Mo. 733, 62 S. W. (2d) 1092.] Plaintiff relies upon a duty to warn arising out of the common-law duty requiring the exercise of ordinary care under the circumstances and not

upon any rule or custom to warn an employee engaged in such work. Were the circumstances here so different from those of section men, yard men, or switchmen that ordinary care required a warning to plaintiff before moving the engine? Considering plaintiff's evidence in the most favorable light with all reasonable inferences which may be drawn in his favor therefrom, as we must do in ruling the demurrer to the evidence, we do not think that plaintiff was in a situation such as was contemplated by the rules laid down in those cases. Plaintiff was not employed to work upon moving trains, engines, or cars, but was to work upon solid ground upon the tracks. He does not seem to have ever done any other kind of railroad work. It was only occasionally that he or other section men were called to shovel coal in a tender. This was, for them, work under unusual conditions, and the risks incident to it were not similar to the risks ordinarily incident to their regular employment. Plaintiff's evidence tends to show that the section men did not do this work upon a moving engine and it seems reasonable from the evidence that they would not do so. Defendant, in fact, recognizes this, in arguing its right to an accident instruction, saying: "A sloping pile of coal of the character ordinarily used in locomotives *affords exceedingly unstable support for a man standing on top of it,* particularly when working there or even when merely standing on its sloping side, and that a slide is likely to occur at any time under such circumstances *with the locomotive and tender stationary."* Indeed, it is to be doubted if a fireman, accustomed to shoveling coal on a moving train, would stand on top of a pile of loose coal five feet high, to do so, while it was moving.

It seems reasonable to suppose that one reason for having the section men move the coal forward, while the train was in the yards, was to obviate the risks incident to the firemen doing so while running on the road.

Plaintiff, when ordered to do the work, says that he protested to his foreman about doing it while the engine was moving around. The foreman assured him that it would not be necessary to work on a moving engine, as they would soon stop to go to supper. Plaintiff got on the engine and rode there without attempting to do the work while the switching movements were continued. He inquired of the enginemen about them going to supper and was told they had already been and so learned that he would not have the opportunity to do the work while they were stopped for that purpose. He had been ordered to do the work but was confronted with a change of the conditions which he had been led to expect, but still he did not attempt to get up on the coal pile in the tender and move it while the engine was moving. At most, it could be no more than a jury question whether plaintiff was guilty of contributory negligence in

doing the work at all under the changed conditions. It is to be noted that it was only when the engine did stop, under circumstances which the jury could reasonably believe warranted plaintiff in thinking it would remain stationary for some time, that he got up on the coal pile and commenced his work. The enginemen knew he was on the tender because they had stopped to let him on to do this work for their benefit and at their request. They had reason to know that he did not expect to do the work while the engine was moving, from their former experience, from his inquiry about them stopping to go to supper, and from the fact that he did not commence work until they brought it to a stop. Actions are said to sometimes speak louder than words. If plaintiff had been shoveling coal for five minutes, they could not help but know that he was doing the work because they were standing or sitting directly in front of where he was throwing the coal. Under such circumstances we think that ordinary care required them to give him some kind of a warning before suddenly moving the engine. Plaintiff, working on such an unstable place, had little chance to protect himself from being thrown down unless he was first warned of a movement. He was engaged in work which required his attention to such an extent that he could hardly observe the enginemen all of the time, while doing it, to see when they were about to start. All the engineer had to do to start the engine, when sitting in the cab, was to reach out and move the throttle. Plaintiff, to know of and protect himself from such a movement, would not only have to look toward him all the time but would also have to stay in a position where he could observe his movements inside of the cab.

In discussing the duty of a master to a servant in this kind of a situation, in 3 Labatt's Master and Servant, 2929-31, section 1112, it is said:

"One very common aspect of the duty to provide a safe system is presented in those cases in which the gravamen of the complaint is a breach of the obligation to warn a servant against perils arising from the manner in which the instrumentalities are affected by isolated events which occur at more or less frequent intervals during the performance of the servant's work, but which produce no permanent effect upon the intrinsic condition of the instrumentalities themselves. . . . The warning may take the form of some signal informing the servant that the change is imminent. . . . This obligation is one which arises out of the duty to conduct the business on a safe system. . . . One phase of the obligation is indicated by the principle that the master is bound to see that no order with respect to change of position of the subject of the work shall be executed without due warning to the employee. . . . Under such circumstances it is reasonable to infer the existence of an absolute

duty on the master's part to make arrangements for imparting a timely warning to any servant who may be imperiled by such a cause. The most numerous illustrations of the duty to give warning are furnished by those cases in which the danger was produced by the movements of railway rolling stock, or other similar appliances.'' [See, also, 39 C. J. 456, 462, secs. 572-577, p. 634, sec. 743, p. 638, sec. 749.]

Illustrations of situations in which this duty may arise are shown by a number of Missouri cases. In Weaver v. St. Louis-San Francisco Railroad Co., 170 Mo. App. 284, plaintiff, a car cleaner for the Pullman Company, one of the defendants, was inside a car standing on the top of a small stepladder washing the ceiling. Other cars were coupled onto it in a manner not violent or unusually severe but enough to throw plaintiff from the top of the ladder to the floor and injure her. The court, in holding the Pullman Company liable because its foreman in charge of the work failed to warn plaintiff that other cars were about to be coupled on, said:

''Plaintiff was the servant of the Pullman Company, engaged in her master's work which she was performing in the proper place and manner. She was in a position where a sudden and unexpected movement of the car would imperil her safety and where she was utterly helpless and unable to protect herself. She was compelled to depend on the care of others for her safety and it was the duty of her master in discharging its obligation to exercise reasonable care to provide its servant with a reasonably safe place in which to work, to adopt reasonable means to prevent the car from being moved while she was in a position so dangerous. Scanlon, the foreman, knew that three of the cars belonging to the train were absent and might be switched in at any time. Further he knew that such occurrence was so infrequent that plaintiff would not be looking for it and that she might be in a position of utter helplessness and danger. He had no control over the movement of cars by the railroad company, but he did have opportunity and means for protecting his servant either by flagging the cars on which the cleaners were working or by keeping a lookout for the missing cars and giving timely warning to his servants of their approach.''

A somewhat similar case was Johnson v. Brick & Coal Company, supra. In that case plaintiff was working on top of a car of coal picking out and throwing away rock and other substances. Other cars were coupled onto the coal car without giving plaintiff any warning and he was thrown out and injured. While plaintiff there relied upon the assurance of the foreman of the coal company that he would warn him of a switching movement, this court said that both the coal company and the railroad company were liable because ''the plaintiff had the right to assume that the defendants would not imperil his safety by permitting or causing the car on which he

was at work to be struck by other cars and moved without notice or warning to him'' (citing many authorities); and further said:

''Nor can the defendants, or either of them, escape the result of causing or permitting cars to be pushed against the car upon which the plaintiff was working, without warning, by showing that they or either of them habitually neglected to do so. This is upon the principle that no custom or usage can make that lawful which is unnecessarily dangerous; and no one will say that to push cars back against the one on which the plaintiff was at work without warning was not unnecessarily dangerous.''

In Koerner v. St. Louis Car Co., 209 Mo. 141, 107 S. W. 481, plaintiff was injured while painting a car when other cars were without warning coupled onto it. This court, holding the railroad liable, said:

''But there is another view upon which the plaintiff was entitled to have his case submitted to the jury. It is the duty of the master to provide and maintain a reasonably safe place for his servant to work. (Citing authorities.) When then the defendant, through the paint boss, Mehlin, sent the plaintiff to work upon the unfinished car, on one of its tracks, it was its duty to provide against other cars running down against the car upon which he was working and to see that other cars which were pulled out were not attached to the car upon which he was working, without giving him warning of its intention to move the said car.''

Likewise, Tetwiler v. St. L., I. M. & S. Railroad Co., 242 Mo. 178, 145 S. W. 780; Ostertag v. Union Pacific Railroad Co., 261 Mo. 457, 169 S. W. 1, and Carbaugh v. St. Louis-San Francisco Railroad Co. (Mo. App.), 2 S. W. (2d) 195, are authorities for the proposition that it is common-law negligence, irrespective of rule, custom or statute, to suddenly move an engine without warning when an employee is in a position where it will strike him and has no reason to expect or look out for such a movement. In a very recent case, Mitchell v. Wabash Railroad Co., 69 S. W. (2d) 286, l. c. 291, where plaintiff was injured by movement of a turntable, moved without warning, after he had been sent to operate it, this court said:

''If, as he testified, plaintiff was ordered by Burnley to operate the table, Burnley and the railway company owed him the duty to use reasonable care to protect him from injury while acting in obedience to that order. If permitting the table to be moved without warning to him while he was so engaged threatened injury to him and Burnley so knew or in the exercise of ordinary care should have so known, then plaintiff was entitled to warning of such impending movement of the table regardless of custom.''

We hold that, under the circumstances disclosed by plaintiff's evidence, plaintiff was not engaged in the class of work where an employee is required to protect himself; that defendant did owe him a

duty to warn him of a sudden movement of the engine after he commenced this work; and that the jury were justified in finding that it was negligence to so move the engine, while he was working on top of the coal pile in the tender, without giving him warning. The court was therefore correct in overruling defendant's demurrer to the evidence.

■ Defendant further assigns as error the refusal of the following instructions requested by it:

"The Court instructs the jury that if you find and believe from the evidence that plaintiff was injured, if you find he was injured, by reason of an accident, that is an occurrence which happened without negligence of either plaintiff or defendant, then in that event your verdict must be in favor of the defendant."

Defendant does not question the rule of Hogan v. Public Service Company, 322 Mo. 1103, 19 S. W. (2d) 707; Sloan v. Polar Wave Ice & Fuel Company, 323 Mo. 363, 19 S. W. (2d) 476; Wright v. Quattrochi, 330 Mo. 173, 49 S. W. (2d) 3; Mitchell v. Dyer (Mo.), 57 S. W. (2d) 1082; and Brewer v. Silverstein (Mo.), 64 S. W. (2d) 289; that "when the issue is simply one of defendant's negligence vel non the giving of an accident instruction is error;" that "only when the record supports an inference that the occurrence proceeded from an unassignable cause may the instruction be given;" that it is not proper to give such instruction merely because "the evidence permits an inference that the parties were innocent of negligence . . . unless there is something in the record tending to show the casualty resulted from an unknown cause;" and that "though there be a doubt as to the negligence it does not follow there is also a doubt as to the cause of the mishap." Defendant says that the jury had a right to disbelieve plaintiff's testimony that the engine moved when he fell and still believe that he fell, and this would justify an accident instruction on the theory that the jury might find from his testimony that he fell because the coal pile slipped with him while the engine was standing still. The trouble with that contention is that even though the jury did not believe defendant's testimony that the engine was moved without warning him, and find that he was not caused to fall thereby, there is still no evidence in the record tending to show that the coal pile ever slipped at all, while the engine was standing still, by mere accident, or otherwise, and that such a slip or slide caused plaintiff's fall and injury. The jury could only reach that conclusion by guess, speculation and surmise and not from evidence. Plaintiff's evidence is positive that the coal did not slip while the engine was standing still and that the engine did move and throw him down. Even defendant's evidence does not tend to prove that the coal slipped, while the engine was standing still, but that instead that no such incident ever oc-

curred at all; that plaintiff never did fall; and that he never did get any coal in his eyes. Moreover, we note that defendant did obtain the following instruction, which was all it was entitled to under the evidence, namely:

"The court instructs the jury that, if from consideration of all of the evidence, you are unable to determine what caused the injury, if any, to plaintiff's eyes, or either of them, then the plaintiff cannot recover and your verdict must be for the defendant."

■ Defendant also assigns error because, while custom to warn was not alleged, plaintiff was permitted over its objection to testify that on previous occasions, when he was coaling an engine, the enginemen "would always whistle or *holler at me or tell me*" and "*generally hollered at me* or told you to brace yourself or whistle or rang the bell long before they moved." No custom to warn was pleaded but none was submitted as a basis of recovery. This evidence was not offered as evidence of a general custom. It showed only the personal experience of plaintiff in former instances and it is to be doubted that it was inclusive enough to show a general custom of that work. [See Jones v. St. Louis-San Francisco Ry. Co., 325 Mo. 1153, 30 S. W. (2d) 481.] It would, of course, be error to allow plaintiff to submit and recover upon a violation of a custom not pleaded but injected into the case by evidence introduced over defendant's objection. That is not the situation here and we hold that plaintiff's testimony as to what the enginemen had done in the way of giving a warning to him on former occasions went only to establish evidentiary facts which were competent to show that plaintiff did not assume the risk and was not guilty of contributory negligence as a matter of law, in proceeding to do the work without knowing that the engine would not be moved before he completed it, and, therefore, also upon the issue of what ordinary care required in the work plaintiff was doing. [Norton v. Wheelock, 323 Mo. 913, 23 S. W. (2d) 142; Woodward v. Missouri Pacific Railroad Co., 316 Mo. 1196, 295 S. W. 98; Carbaugh v. St. Louis-San Francisco Railroad Co. (Mo. App.), 2 S. W. (2d) 195.] Defendant "could have tendered an instruction limiting the effect of this evidence."

■ Defendant further complains of this court's refusing to remand the case "because of the inability of the stenographer to furnish a complete transcript of the evidence and proceedings in the case" and contends "that the overruling of said motion denied defendant the equal protection of the laws and that an affirmance of the judgment below on the record now before the court would deprive it of its property without due process of law, as prohibited by Section 1 of the Fourteenth Amendment to the Constitution of the United States." This involved only the evidence of one of plaintiff's medical experts, which had nothing to do with the question of whether plain-

tiff was injured in the manner he claimed or whether defendant was negligent. It is set out in narrative form and goes to the possibility of such an injury causing the loss and impairment of plaintiff's eyes and to the extent of his injuries and disability. Defendant obtained a *remittitur* of almost half of the verdict in the trial court and makes no point upon this appeal about the amount of the final judgment. We therefore hold there is no merit in the proposition that the cause must be remanded because the evidence of this witness cannot be produced in question and answer form.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.