Daisy Ingram, Administratrix of Estate of J. G. Ingram, v. Mobile & Ohio Railroad Company, Appellant.—30 S. W. (2d) 989.

Division One, September 4, 1930.

*Carl Fox* and *R. P. & C. B. Williams* for appellant.

*C. O. Inman* and *W. H. Douglass* for respondent.

RAGLAND, J.—John Q. Ingram, an employee of defendant, was killed through its alleged negligence in its railroad yard at Corinth, Mississippi, in the early morning of February 18, 1927, while employed in interstate commerce. This action is to recover for his death, and was brought by his administratrix for the benefit of his widow and minor children. The casualty happened while a train crew of which deceased was a member was engaged in switching a cut of twelve freight cars from the main line to a switch track. A brief description of the yard and tracks is necessary to an understanding of the train movement, and Ingram's connection therewith, which caused his death.

Defendant's main line runs north and south through its yard at Corinth; there is a passenger station on the east side of the track, and in its immediate vicinity a restaurant; just across from the station, there is a water plug where engines take water; a short distance west of the water plug there is a small building used by defendant as a yard office. The main line track is crossed 687 feet south of the station by Tate Street, a public thoroughfare running east and west; it is crossed again "a short block," approximately 421 feet, south of Tate Street by Fleming Street, another east-and-west street; Tate Street is 30 feet wide.

Ten feet south of Tate Street a switch track called the "lead" connects by means of a switch, the "lead switch," with the main line on the east side and extends from thence in a southeasterly direction; the main line, the lead and a base at some indefinite distance south form a right-angle triangle of which the lead is the hypotenuse. Inside the triangle and connecting with the lead by means of "Switch No. 1," 132 feet south of the lead switch, switch

track No. 1 extends south along and paralleling the main track, on the east side thereof; immediately east of that switch track and paralleling it switch track No. 2 takes off from the lead at "switch No. 2," 110 feet south of switch No. 1, and extends south. Both switch tracks extended beyond Fleming Street. To recapitulate as to distances: from the water plug to the north boundary of Tate Street is 687 feet; from the north to the south boundary of Tate Street is 30 feet; from the south boundary of Tate Street to the lead switch is 10 feet; from the lead switch to switch No. 1 is 132 feet; from switch No. 1 to switch No. 2 is 110 feet; and from switch No. 2 to the Fleming Street crossing is approximately 169 feet. There were no electric lights in the vicinity of either street crossing.

The freight train in question arrived at Corinth at about 12:05 A. M.; it was in charge of a crew, consisting of Ingram, rear brakeman, Jimerson, head brakeman, and a conductor, engineer and fireman; it had come from the south and was headed north. Before the train reached Corinth the entire crew knew that twelve cars, the forward end of the train, were to be cut out and left at that place, but they did not know the particular disposition that was to be made of them. The train was accordingly stopped and cut at or just south of the Fleming Street crossing; the engine to which the twelve cars were attached then proceeded on north until the engine came alongside the water plug in position to receive water. The rear car of the cut was a tank car, and when the engine and cut came to a stop this car was about a car-length north of the Tate Street crossing. On arrival in the yard the conductor went across to the yard office and there received instructions to shove the twelve cars south on switch track No. 1, beyond the Fleming Street crossing; he communicated these instructions to brakeman Jimerson, and probably also to the engineer. He then went back to the yard office to check his way bills. Presently brakeman Ingram came to the restaurant where Jimerson was. Jimerson repeated the instructions he had received from the conductor and both then started south to the switches, walking along the east side of the train. It was raining and the night was very dark.

(The facts stated in the preceding paragraph are conceded. Those now to be narrated are gathered from the testimony of plaintiff's witnesses, and principally that of Jimerson.)

When they reached the lead switch, Jimerson threw it, lining the lead with the main track; Ingram said, "I will line No. 1," he then walked on and threw switch No. 1. Jimerson did not see Ingram when he threw the switch, though only 132 feet away, but he saw the light on the switchstand change from green to yellow, and by that he knew that the switch had been lined. About that time the engineer blew a back-up signal, three short blasts, and in response

Jimerson, with his lantern, gave the engineer a back-up or come-ahead signal. Presently the engine and cut of cars were put in motion, rolling south. It was Jimerson's duty to protect the Tate Street crossing; but as soon as the crossing was blocked by the moving cars he turned and walked south along the lead switch. When he turned and started south he saw from the movements of Ingram's lantern that he, Ingram, was also walking south, between switch tracks Nos. 1 and 2. Shortly thereafter Ingram stepped from the path between the switch tracks, along which he had been walking, on to track No. 1, the track upon which the cars were moving south. Within the time thereafter that would be required for him to take three or four steps his lantern disappeared. As soon as Ingram stepped on to the track Jimerson gave the engineer a stop-quick signal; the engineer responded immediately and brought the cars to a stop within about two car-lengths. Ingram was found badly injured between tracks Nos. 1 and 2, opposite No. 2 switch.

It was Ingram's duty to protect the Fleming Street crossing; after throwing switch No. 1 he had the choice of waiting and riding the forward car (as they were then moving or about to move), or of walking on to the crossing in advance of the train. The cinder path just ahead of him at the time he left the path and went upon track No. 1 was covered with water an inch or more deep.

Jimerson as witness did not know whether Ingram had given a back-up signal after throwing switch No. 1; he did not see him give a signal of any kind. However, his attention was diverted from Ingram almost immediately following the throwing of the switch; upon the sounding of the back-up signal by the engineer, he turned and gave a signal in response and then took up his watch at the Tate Street crossing.

Ingram had had more than twenty years' experience in railroading, as brakeman and as conductor, and he was perfectly familiar with the yard at Corinth, including the relative locations of the tracks, switchstands and street crossings. He was the senior brakeman and was in charge of the switching movement in question, the conductor being absent.

Evidence was introduced as to the custom which obtained in defendant's yard at Corinth with respect to communicating signals to the engineer. McCord, a witness for plaintiff, who had worked in the yard for about four years prior to 1922, testified:

"There was a custom in effect in February, 1927, with reference to the giving and relaying of signals from the field man to the head brakeman, from the head brakeman to the engineer. The custom was that the advance man, or the field man, would always give the signal. Of course, there are places where there are obstructions when a man can't see the other one, but the head man is supposed

to stay in sight of the field man, so he can see the signals. . . . It was the custom that the head brakeman should not give a signal to the engineer before getting a signal from the field man. The head brakeman was to watch the field man and his signals.''

Carver, the conductor, who was called as witness by plaintiff, said:

''There was no fixed or set custom or practice in the Corinth yards at that time with reference to the head brakeman receiving signals from the flagman and other brakeman.''

Jimerson, also a witness for plaintiff, testified:

''Q. And from whom did you receive your signals? A. The engineer.

''Q. I mean about the movement, from whom would you—just describe the method of relaying signals that—A. He would give a back-up signal and I gave him a signal to come on back. I wasn't supposed to have a signal from anyone else; the switches were all lined and the track clear.''

Forlines, the trainmaster in defendant's yard, called as a witness by defendant, testified:

''There has never been any practice or custom in those yards that the head brakeman should receive signals from the field brakeman exclusively. The signals were to be given by either or both of them, because they are working close together, and they are both in view of each other. . . . I say it is not the custom for the head brakeman to first get the signal from the field man before he gives it to the engineer, if they are working together. If they were so far apart that the engineer could not see which man signaled, then that would be necessary.''

And Pipkin, the engineer, a defendant's witness, testified:

''It was the custom for the head brakeman to relay signals to the engineer when the other man cannot be seen by the engineer. . . . According to the rule, custom and practice in the yards at Corinth, Mississippi, at the time of the accident, if Jimerson, the head brakeman, threw the switch on the lead track, and Ingram, the rear brakeman, threw the switch onto track No. 1, then it was proper for either one of them, or both of them, to give the back-up signal. In this case they both gave a back-up signal.''

One of defendant's rules for the guidance of its employees was as follows:

''The engine bell must be rung when the engine is about to move and while approaching and passing public crossings at grade.''

Plaintiff's witness, McCord, testified:

''Q. I will ask you to tell the jury whether or not there was any practice or custom of the M. & O. Railroad, in effect February, 1927, with reference to the ringing of a bell when a locomotive and

cars were being moved in the yard at that place? A. It has always been the custom since I worked there.  . . .

"Q. What was the custom and practice with reference to ringing the bell on the locomotive? A. They would always ring the bell approaching this street crossing—every movement towards street crossings, over and across the street crossing, they would always ring the bell."

Forlines, testifying for the defendant, said:

"The bell is to be sounded before starting the engine, when it has been standing, to warn any one working in, under or around the engine that the train is about to move in a forward motion or backward motion, where there are no cars pushed. We use the bell to notify pedestrians and vehicles on the street crossing in public places."

The fireman, also testifying as a witness for defendant, said:

"It was always customary in the yards at Corinth, Mississippi, at the time of and before Mr. Ingram's death, to ring the bell while the engine and cars were moving in the yards. We always ring the bell when the engine moves, and the bell is always ringing crossing crossings and starting the engine."

And a number of other witnesses testified to the same effect.

The testimony with respect to whether the bell and whistle on the engine were sounded before the cars were put in motion will next be noted:

Jimerson, testified: "I couldn't recall, I just don't know, whether the bell was ringing or had been ringing."

Sparks, a car inspector, while testifying as a witness for plaintiff, said: "I was walking south alongside the train. I don't remember whether I heard the bell ringing on the locomotive moving these twelve cars. I don't recall hearing it. I don't remember hearing it from the time the engine started up until Ingram was hurt. . . . I have no knowledge whether the whistle was blowing or wasn't blowing and have no knowledge whether the bell was ringing or wasn't ringing. I simply don't know. Wasn't paying any attention."

The fireman, testifying for defendant, said: "Before the engine started up the engineer blew three blasts of the whistle. That was the only signal I heard. . . . I couldn't be sure whether the bell started or not."

The engineer, also testifying for defendant, said: "Under the circumstances mentioned, when an enginee is moving in the yards I generally ring a bell. That was the rule and custom of the railroad company at and before that time. I always try to obey the rules, and that causes me to believe that I did it in this case. I remember turning on the bell when I answered the signal with a whistle. What causes me to remember that, I always turn it when

I go to move. I blow my whistle and turn on the bell. . . . It is natural for me to do it, and I am confident I did it at this certain time."

Just one other witness testified with respect to whether the bell was or was not ringing, Terpley, a negro cook employed at the restaurant. About ten o'clock that night he left his place of employment and went to a "colored cafe," where he remained until about twelve o'clock. After that he "went down the alley where a bunch of colored people lived." On the way home subsequently he came to the Tate Street crossing, "going east, and . . . was about ten or fifteen feet from the cut of cars that was backing up." He then noticed the cars in front of him. Presently the cars stopped on the crossing, and he, after waiting a few moments, walked north around the engine and to the east side of the train. The character of his testimony with reference to the bell and whistle is disclosed by the following excerpt from the record:

"Q. Now, going back to when you first saw the cars, I will ask you to state whether or not you heard any bell from a locomotive with this cut of cars before you saw these cars come across the front of you there? A. I don't remember.

"Q. And were you listening for bells or whistles?

"MR. WILLIAMS: I object to that, if your Honor please, as leading.

"THE COURT: That is leading.

"MR. INMAN: Q. Well, state whether or not you—

"MR. WILLIAMS: I object to that.

"A. Well, one naturally crossing any railroad—

"MR. WILLIAMS: Now, I object to that.

"THE COURT: Q. Wait one minute. We don't want to know what 'naturally;' we want to know what you did or did not do? A. I didn't hear a bell or I didn't hear a whistle.

"THE COURT: Q. You didn't hear a bell or you didn't hear a whistle? A. No, sir.

"MR. INMAN: Q. At any time before you saw these cars? A. No, sir.

"Q. As you approached that crossing? A. No, sir.

"Q. Was there any bell ringing from that time up until the time the train came to a stop? A. Why, I didn't hear it.

"Q. When you went around the engine, was the bell ringing? A. No, sir.

"Q. Will you state whether or not, as you approached the crossing there, you were listening for any bell? A. Well, sure—

"MR. WILLIAMS: I object, if your Honor please; he is leading him.

"THE COURT: I think that is perfectly proper, Mr. Williams: what he was doing, whether he was listening. If his mind wasn't on that, why, of course, that is one thing. You may answer the question. Read it to him, Mr. Mills.

" (Question read.)

"To which ruling of the court the defendant then and there excepted and still continues to except.

"A. Listening for a bell.

"The Court: Q. Were you listening? A. Well, I wasn't—yes, sure, I was listening for a bell—compelled to listen for a bell when a cut of cars or a train was crossing the crossing; naturally you would listen for some kind of warning."

The petition contained several assignments of negligence, but all but one were abandoned by plaintiff in the submission. The one on which she went to the jury was as follows:

"Plaintiff further says at the time, and prior thereto, it was the custom and practice of the defendant in this yard, when an engine and cars were standing, to give a signal before moving same, and after moving to continually ring the bell while the engine was being moved in the yard, and that defendant negligently failed to ring the bell while backing said cut of cars onto track No. 1, in accordance with said custom and practice."

A verdict was returned in favor of plaintiff, assessing her recovery at $12,500. From the judgment entered in conformity therewith defendant prosecutes this appeal.

Appellant assigns as error the failure of the trial court to direct a verdict for it, on the grounds: (1) that there was no substantial evidence that the bell was not rung on starting the engine and kept ringing while the engine and cars were moving; (2) that the rule, and the custom and practice thereunder, requiring the engine and bell to be rung, was not intended for the benefit of employees, but for the protection of the public at the crossings; (3) that the alleged negligent failure to warn the deceased by ringing the bell on the engine was not the proximate cause of his injury and death; (4) that decedent assumed the risk in getting upon the track in close proximity to the moving cut of cars; and (5) that decedent having full knowledge of the proposed movement of the cars, and having joined in directing the movement, warning under such circumstances would not have been useful to him, and there was therefore no duty to give it.

Only two witnesses professed to have any knowledge as to whether the bell was rung before the engine moved or was kept ringing during the movement: Terpley, testifying for plaintiff, and the engineer for defendant. A casual reading of the engineer's testimony discloses that he had no independent recollection whatever as to whether he did or did not ring the bell: he was merely "confident" that he started the bell ringing before the engine moved because the rules required it, and he always tried to obey the rules. His testimony has no probative value and may be disregarded.

Terpley at first said that he did not remember whether the bell was ringing when he came to the crossing, but under the leading and suggestive questions that were put to him by plaintiff's counsel he became quite positive that he was listening and that he did not hear either bell or whistle. He argued that one was "compelled to listen for a bell when a cut of cars or train was crossing the crossing." His testimony standing alone, considering the character of his answers and the manner in which they elicited from him, scarcely arises to the dignity of a "scintilla of evidence." But when taken in connection with the fact that no one in the immediate vicinity of the engine, not even one of the operatives engaged in the switching movement, was able to recall having heard the bell, it was perhaps sufficient to take the question to the jury.

His testimony as to not hearing the whistle, however, stands on a different footing. The conclusions reached by him that he was listening and did not hear the whistle, arrived at by his own peculiar mental processes, cannot be accorded any weight in the face of the positive affirmations of the engineer, the fireman and the head brakeman, the members of the crew immediately engaged in the train movement, that the back-up signal consisting of three short blasts of the whistle was given before the engine moved,—especially so since it does not appear where Terpley was or what he was doing at the time it is said that the signal was given.

The rule required the bell to be rung "when the engine was about to move," and "while approaching and passing public crossings." But the custom followed was to keep the bell ringing "while the engine and cars were moving in the yards." No witness attempted to interpret the custom in respect to the persons it was designed to protect when the engine was *not* approaching or passing a public crossing. But it is manifest that it was intended in a general way to afford protection to employees at work in the yard as well as to persons using the crossings. It does not follow, however, that the custom of ringing the bell on a moving engine was intended to protect, or did protect, the particular employees engaged in directing and controlling the engine's movement. That question, considered solely with reference to the facts of the instant case, will be taken up later.

There is disagreement between counsel as to whether the evidence disclosed that at and prior to the casualty resulting in Ingram's death there had been a custom and practice followed in defendant's yard whereby all signals given the engineer in a switching movement were required to originate with the field man, the rear brakeman. Touching that matter there is no essential conflict in the evidence. It tended to show that where the field man and head brakeman were working close enough together to observe each other's movements, and both within the view of the engineer, it was customary for

either or both to give the signals; but if they were some distance apart, the fieldman signaled, and if he could not be seen by the engineer, his signal was relayed by the head brakeman. This is the only reasonable interpretation which can be put upon the evidence as a whole.

After Ingram threw switch No. 1, lining switch track No. 1 with the lead and the main line, but one duty remained for him to do, so far as the particular switching movement was concerned, and that was to protect the Fleming Street crossing. In order to do that it was necessary for him to be at the crossing when the cut of cars reached it so that he could advise the engineer by signal whether the crossing was clear. It is respondent's contention that Ingram could not have anticipated that the engine and cars would be put in motion before he had walked to Fleming Street and there given the back-up signal himself. There is not a particle of evidence in the record from which such an inference can be drawn. On the contrary, plaintiff's witness, Jimerson, testified: ''I wasn't supposed to have a signal from any one else; the switches were all lined and the track clear. . . . I couldn't tell from his (Ingram's) movements what his purpose was in walking south. It was his duty to get on those cars and ride them south himself to Fleming Street crossing.'' One of defendant's witnesses, the train master, said that it would have been proper for Ingram to either ride or walk. (The distance from switch No. 1 to Fleming Street was only 279 feet.) Evidently he set out to walk, and it is to be inferred that he stepped up on the track to avoid walking in the water which covered the path between the tracks. It is respondent's further contention that if the engine bell had been ringing, Ingram would have received timely warning of the approach of the cars and so escaped injury and death. Did appellant, all the circumstances considered, owe Ingram the duty of keeping the bell ringing while the cars were moving in the execution of the switching movement? That is the crux of the case.

The engineer testified that the two brakemen gave back-up signals simultaneously, but as he was defendant's witness his testimony cannot be considered on demurrer, although uncontradicted. Plaintiff's evidence neither affirms nor denies that Ingram gave a back-up signal after throwing switch No. 1. The record therefore will be treated as silent on that question. But regardless of whether Ingram gave a back-up signal, his action in throwing switch No. 1, which completed the lining of that switch track with the main track, was of itself an invitation to the engineer to come ahead. The engineer, evidently noting the changing of the colors of the switch lights, so construed it, for immediately thereafter he blew a back-up signal, meaning, shall I come ahead? It was the duty of one of the brakemen at least to give a signal in answer, and Jimerson did, signaling

to come ahead. Now Ingram was in charge of and directing the switching operation, it must therefore be assumed that he was giving his attention to what was transpiring in connection therewith, and accordingly that he heard the back-up signal given from the engine, as did Jimerson, and saw Jimerson, standing a few feet away, give the signal in response. This must be true unless he was deaf or blind, and there is no suggestion that he was either. The inferences arise upon the conceded facts and those which plaintiff's evidence tends to establish, and they are necessary ones.

Did Ingram know that the engine and cut of cars were put in motion in response to and immediately following Jimerson's signal? He evidently thought so, regardless of whether or not he heard the engine bell ringing; otherwise, he himself would have repeated the back-up signal; instead he turned and walked towards the Fleming Street crossing. The tank car at the south end of the cut was 259 feet north of switch No. 1. Ingram, therefore, knew when he left switch No. 1 that the cut of cars, but 259 feet away, was moving south on switch track No. 1. It was then his duty to keep himself advised as to the progress the cars were making in their movement toward Fleming Street, not only because the responsibility of supervising and directing their movement rested upon him, but because he was especially charged with seeing that they did not pass over Fleming Street before he had ascertained that the crossing was clear: if he was unable to either see or hear the approaching cars on account of the darkness and rain; he could have stood by and waited until they came up, stopped them if necessary, and then rode the forward one to the crossing. The evidence affords no basis for an inference that Ingram had a right to rely, or that he did rely, on the ringing of the engine bell to give him the knowledge he was required to have as to the movement of the cars.

Ingram being charged with the duty of knowing where the cars were at every stage of the movement, and having at hand the means of obtaining such knowledge, there was no duty on the part of appellant to warn him by bell or otherwise. It could not have been anticipated that he would step blindly upon the track immediately in front of the moving cars. [Hines v. Kesheimer's Admrx., 249 S. W. (Ky.) 1001; New York, O. & W. R. Co. v. Oles, 296 Fed. 474.]

It is unnecessary to consider the questions of proximate cause and assumption of risk. The judgment of the circuit court is reversed. All concur.